Filed 5/8/17

# IN THE SUPREME COURT OF CALIFORNIA

CHRISTOPHER MENDOZA, )
)
    Plaintiff and Appellant, )
)     S224611
    v. )
)     9th Cir. Nos.
NORDSTROM, INC., )     12-57130/12-57144
)
    Defendant and Respondent; )     C.D. Cal. No.
)     8:10-CV-00109-CJC-MLG
MEAGAN GORDON, )
)
    Intervener and Appellant. )
_____)

    The Ninth Circuit Court of Appeals has asked this court to resolve unsettled questions concerning the construction of the state's day of rest statutes, Labor Code sections 550–558.1.[1] (*Mendoza v. Nordstrom, Inc.* (9th Cir. 2015) 778 F.3d 834; see Cal. Rules of Court, rule 8.548.) These statutes prohibit an employer from "caus[ing] his employees to work more than six days in seven" (§ 552), but do not apply "when the total hours of employment do not exceed 30 hours in any week or six hours in any one day thereof" (§ 556).

    The Ninth Circuit asks:[2]

---

**1**     All further unlabeled statutory citations are to the Labor Code.

**2**     We have reframed these inquiries slightly. (See Cal. Rules of Court, rule 8.548(f)(5).)

1. Is the day of rest required by sections 551 and 552 calculated by the workweek, or does it apply on a rolling basis to any seven-consecutive-day period?

2. Does the section 556 exemption for workers employed six hours or less per day apply so long as an employee works six hours or less on at least one day of the applicable week, or does it apply only when an employee works no more than six hours on each and every day of the week?

3. What does it mean for an employer to "cause" an employee to go without a day of rest (§ 552): force, coerce, pressure, schedule, encourage, reward, permit, or something else? (See *Mendoza v. Nordstrom, Inc.*, *supra*, 778 F.3d at p. 837.)

We answer, as more fully explained below:

1. A day of rest is guaranteed for each workweek. Periods of more than six consecutive days of work that stretch across more than one workweek are not per se prohibited.

2. The exemption for employees working shifts of six hours or less applies only to those who never exceed six hours of work on any day of the workweek. If on any one day an employee works more than six hours, a day of rest must be provided during that workweek, subject to whatever other exceptions might apply.

3. An employer causes its employee to go without a day of rest when it induces the employee to forgo rest to which he or she is entitled. An employer is not, however, forbidden from permitting or allowing an employee, fully apprised of the entitlement to rest, independently to choose not to take a day of rest.

**FACTUAL AND PROCEDURAL BACKGROUND**

The relevant facts are undisputed. Christopher Mendoza and Meagan Gordon are former employees of Nordstrom, Inc. (Nordstrom), a retail chain with

locations throughout California.  Mendoza worked as a barista and later a sales representative for Nordstrom in San Francisco and San Diego; Gordon worked as a sales associate in Los Angeles.  On several occasions, Mendoza was asked by a supervisor or coworker to fill in for another employee, with the result that he worked more than six consecutive days.[3]  During each of these periods, some but not all of Mendoza's shifts lasted six hours or less.  Similarly, on at least one occasion Gordon worked more than six consecutive days, with some but not all of her shifts lasting six hours or less.[4]

Mendoza sued Nordstrom in state court, alleging, inter alia, that it had violated sections 551 and 552 by failing to provide him statutorily guaranteed days of rest.  The suit was filed as a putative class action on behalf of nonexempt California Nordstrom's employees, and the day of rest claim was brought pursuant to the Labor Code Private Attorneys General Act of 2004 (PAGA).  (See §§ 2698–2699.5.)[5]  Nordstrom removed the action to federal court based on diversity jurisdiction.  (See 28 U.S.C. § 1332(d).)  After removal, the parties stipulated to Gordon's filing a complaint in intervention.  Gordon's complaint likewise was a

---

[3]     These periods stretched from Monday, January 26, to Thursday, February 5, 2009; from Monday, March 23, to Sunday, March 29, 2009; and from Tuesday, March 31, to Tuesday, April 7, 2009.  Nordstrom's established workweek runs from Sunday to Saturday.

[4]     Gordon worked each day from Friday, January 14, 2011, to Friday, January 21, 2011.

[5]     PAGA authorizes an aggrieved employee to bring suit for specified Labor Code violations in a representative capacity and obtain civil penalties, which are then shared between the affected employees and the state.  (§ 2699, subds. (a), (i); *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 379–382; *Arias v. Superior Court* (2009) 46 Cal.4th 969, 980–981.)

putative class action and also included a PAGA claim for violation of sections 551 and 552.

The district court granted summary judgment on claims other than the day of rest claims. Because PAGA authorizes a representative action without the need for class certification (*Arias v. Superior Court*, *supra*, 46 Cal.4th at p. 975), plaintiffs withdrew their motion for certification. The court then held a bench trial on the merits. After trial, it concluded: (1) section 551 guarantees a day of rest on a rolling basis, for any seven consecutive days; but (2) under section 556, the guarantee does not apply so long as an employee had at least one shift of six hours or less during the period, as Mendoza and Gordon did; and (3) Nordstrom did not "cause" Mendoza or Gordon to work more than six consecutive days because it did not force or coerce them to do so. The court dismissed the action.

After plaintiffs timely appealed, the Ninth Circuit filed an order requesting that we resolve unsettled questions of California law relating to the operation of the state's day of rest statutes. (*Mendoza v. Nordstrom, Inc.*, *supra*, 778 F.3d 834.) We granted the request.

## DISCUSSION

I.     *Sections 551 and 552: When Is a Day of Rest Required?*

Two related provisions of the Labor Code ensure day of rest protection for employees. First, "[e]very person employed in any occupation of labor is entitled to one day's rest therefrom in seven." (§ 551.) Second, "[n]o employer of labor shall cause his employees to work more than six days in seven." (§ 552.) We consider whether this protection applies on a week-by-week basis or on a rolling basis. Under the weekly interpretation, the calendar is divided into seven-day blocks, and these provisions ensure at least one day of rest in each block, but an early day of rest in one week and a late day of rest in the next may lead to an employee working seven, eight, or more days in a row—though no more than six

4

days out of seven, on average. Under the rolling interpretation, the provisions apply on an ongoing day-by-day basis, so that any employee who has worked the preceding six days in a row is presumptively entitled to rest on the next day.

A. Text and History

We begin with the text, but find it manifestly ambiguous. An assurance that an employee will not be required to work more than six days in seven could be interpreted as prohibiting a required seventh day of work any time an employee has worked the previous six, as Mendoza and Gordon would have it, but it could equally be interpreted as ensuring that, sometime during each week, every employee will be entitled to at least one rest day, as Nordstrom would have it. On the one hand, neither section contains the word "week," as Mendoza and Gordon stress. On the other, had the Legislature intended to protect against *any* seven consecutive days of work, it could have chosen more specific language that, unlike the phrase "more than six days in seven" (§ 552), does not evoke the concept of a day of rest *each week* (e.g., "An employer shall not cause an employee to work more than six days straight" or "in a row" or "consecutively"). The statutory language is not so plain as to conclusively embrace only one meaning.

In addition, the available history concerning the circumstances of enactment sheds limited light. Early attempts by the Legislature to regulate the days when businesses could operate mandated a weekly closure on a specific day. (Stats. 1858, ch. 171, § 1, pp. 124–125 [requiring specified establishments to close "on the Christian Sabbath, or Sunday"]; Stats. 1861, ch. 535, § 1, p. 655 [restricting operation "on the first day of the week, commonly called Sunday"]; Pen. Code, former § 300 as codified in 1872 [prohibiting the operation "on Sunday" of most businesses].) These laws were met with religious objections and sometimes struck down (*Ex parte Newman* (1858) 9 Cal. 502 [declaring the 1858 law unconstitutional]) or repealed in the face of such criticisms (see *Ex parte*

5

*Koser* (1882) 60 Cal. 177 [upholding Pen. Code, former § 300 by a four-to-three vote]; Stats. 1883, ch. 2, § 1, p. 1 [repealing former § 300 in the wake of *Koser*]). The 1893 law departed from prior statutes by providing for a day of rest without specifying *which* day should be taken. (Stats. 1893, ch. 41, § 1, p. 54 [directing "one day's rest therefrom in seven"].) It thus met the objection that legislating a uniform weekly day of rest favored some religions over others and infringed on the state Constitution's free exercise guarantee. (See Cal. Const. of 1849, art. I, § 4; *Newman*, at pp. 505–507 (opn. of Terry, J.); *id.* at pp. 513–515 (conc. opn. of Burnett, J.); *Koser*, at pp. 201–206 (dis. opn. of McKinstry, J.); *id.* at p. 207 (dis. opn of Ross, J.); *id.* at pp. 207–209 (dis. opn. of Sharpstein, J.).) But inferring that the 1893 statute was drafted to remain agnostic as between the practices of different denominations and as between believers and nonbelievers does not help us resolve the present-day dispute. Given that religious days of rest, though they vary between denominations, typically recur on the same day each week, the statute could be understood as extending a guarantee of a day of rest every week, on a day of the individual's choosing, or, equally, a day of rest at least every seventh day.

To illuminate the intended meaning, we thus turn to other interpretive sources, including the regulatory and statutory contexts of which the day of rest laws are a part.

### B.     Industrial Welfare Commission Wage Orders

The provisions of the Labor Code are not to be construed in isolation, but in harmony with a second set of rules governing employment. The Legislature established the Industrial Welfare Commission (IWC) a century ago to regulate and protect the working conditions of women and minors. (*Martinez v. Combs* (2010) 49 Cal.4th 35, 54–55.) The IWC carried out that mission by adopting a series of wage orders, quasi-legislative enactments "establishing minimum wages,

6

maximum work hours, and conditions of labor." (*Kilby v. CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1, 10; accord, *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026.) As a result, "wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC." (*Brinker Restaurant Corp.*, at p. 1026.)

Our role in interpreting the IWC wage orders and reconciling them with the Labor Code is settled: "The IWC's wage orders are to be accorded the same dignity as statutes. They are 'presumptively valid' legislative regulations of the employment relationship [citation], regulations that must be given 'independent effect' separate and apart from any statutory enactments [citation]. To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes." (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1027.)

In 1919, the IWC first guaranteed a weekly day of rest for workers in the mercantile industry: "No person, firm or corporation shall employ, or suffer or permit any woman or minor to work in any mercantile establishment more than eight (8) hours in any one day, or more than forty-eight (48) hours in any one week, or more than six (6) days in any one week." (IWC wage order No. 5 Amended, subd. 8 (June 21, 1919); see IWC wage order No. 5, subd. 12 (July 31, 1920) [same]; IWC wage order No. 5A, subd. 13 (Apr. 8, 1923) [same].) In 1943, the IWC added to this requirement a presumption that Sunday would be the weekly day of rest absent other arrangements: "Every woman and minor shall have one day's rest in seven. Sunday shall be considered the established day of rest for all women and minors unless a different arrangement is made by the

7

employer for the purpose of providing another day of the week as the day of rest." (IWC wage order No. 7NS, subd. 3(c) (June 21, 1943).)

These early wage orders, adopted by the agency entrusted by the Legislature to regulate wage and hour matters, at a time far closer than our own to the enactment of the Legislature's day of rest law, are telling in two respects. First, the IWC's orders, applicable to what was perceived by the Legislature as a more vulnerable portion of the work population, guaranteed only a weekly day of rest rather than at least one day of rest every seven on a rolling basis. We can safely infer the IWC did not intend less day of rest protection for women and children than for the general employee population, and thus that the statutory day of rest protection was understood by the IWC to ensure a weekly day of rest, not a "rolling seven" guarantee. Second, the IWC's 1943 mercantile industry order uses language materially indistinguishable from the statutory guarantee, and interprets that language as ensuring a weekly, rather than rolling, day of rest. (Compare IWC wage order No. 7NS, subd. 3(c) (June 21, 1943) ["one day's rest in seven"] with § 551 ["one day's rest therefrom in seven"].)

In time, the Legislature acknowledged various circumstances where emergencies or the nature of the work might necessitate women working beyond the normal daily and weekly hour limits, and provided for overtime pay. (See Stats. 1953, ch. 1254, § 1, p. 2813.) The IWC followed suit, allowing women to work "in excess of six (6) days in one week" in circumstances where the Labor Code permitted it, so long as they received overtime pay for all work done on the seventh day. (IWC wage order No. 1–52, subd. 3(a)(1) (Aug. 1, 1952).) Consistent with previous wage orders, each subsequent iteration of the mercantile industry wage order continued to make clear that the day of rest guarantee applied on a weekly, rather than rolling, basis. (See IWC wage order No. 7–57, subd. 3(a) (Nov. 15, 1957) [general prohibition against working "more than six (6) days in

8

any one week"]; IWC wage order No. 7–63, subd. 3(a) (Aug. 30, 1963) [same]; IWC wage order No. 7–68, subd. 3(a) (Feb. 1, 1968) [same].)

In 1976, after the Legislature expanded the IWC's jurisdiction to include adult men (see *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 207), the IWC revised the presumption against working more than six days in a week (IWC wage order No. 7–76, subd. 3(A) (Oct. 18, 1976)), while making clear through the addition of an explicit definition that regulation of days of work was on a weekly, rather than rolling, basis. The wage order defined a " '[w]orkweek' " as "any seven (7) consecutive days, starting with the same calendar day each week. 'Workweek' is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods." (*Id.*, subd. 2(N).) The corresponding days of work regulation incorporated this term, henceforth allowing adults to work "more than six (6) days in any one workweek" so long as specified levels of overtime were paid. (*Id.*, subd. 3(A).) Essentially the same rule is still in effect, with overtime premiums for failing to afford a day off calculated on a workweek-by-workweek basis. (IWC wage order No. 7–2001 (Cal. Code Regs., tit. 8, § 11070, subds. 2(Q), 3(A); hereafter IWC Wage Order No. 7–2001); see IWC, Statement as to the Basis re: IWC 2001 wage orders (Jan. 1, 2001) p. 8.)

We must harmonize the foregoing history and wage orders with the statutory guarantees. (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1027.) Interpreting sections 551 and 552 as applying on a weekly rather than rolling basis does so. It subjects employees and employers to a single set of consistent day of rest requirements, thereby facilitating the scheduling of work. Reading the day of rest statutes this way, the IWC's wage orders provide comparable protection but in clearer language, rather than altering or more narrowly guaranteeing employee day of rest protection. Nor does this reading render the wage order and Labor Code requirements redundant, as the sanctions

9

for seventh-day work under each scheme are complementary but different. (Compare §§ 553 [misdemeanor], 558 [civil penalties] with IWC wage order No. 7–2001, subd. 3(A) [premium pay].)

C.     The Statutory Scheme

Statutory context also matters.  "We do not construe statutory language in isolation, but rather as a thread in the fabric of the entire statutory scheme of which it is a part."  (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 11; see *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1099–1100.)  Looking at the surrounding statutory context and how the day of rest statutes fit within the overall scheme, we will prefer an interpretation that renders the Legislature's enactments a coherent whole.  Here, the statutes regulating overtime and identifying exceptions when a day of rest need not be provided are particularly instructive.

Like the IWC in its wage orders, the Legislature has expressly defined a " 'week' " and a " '[w]orkweek' " as "any seven consecutive days, starting with the same calendar day each week."  (§ 500, subd. (b).)  When this chapter of the Labor Code refers to a week or workweek, it means a "fixed and regularly recurring period" (*ibid.*), e.g., Sunday to Saturday, or Monday to Sunday, not a rolling period of any seven consecutive days.

The principal overtime statute affords workers premium pay based not only on daily and weekly hours, but also on seventh-day work.  "[T]he first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. . . .  In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular

10

rate of pay of an employee." (§ 510, subd. (a).) We will return to the significance of this precise phrasing momentarily.

As this provision contemplating work on every day of a workweek implies, the day of rest guarantee is not absolute. (See, e.g., § 554, subd. (a) [making allowance for emergencies and excluding certain categories of work]; *id.*, subd. (b) [authorizing the Division of Labor Standards Enforcement (DLSE) to make hardship exemptions].) Two exceptions in particular shed light on the nature of the underlying guarantee. First, the day of rest provisions shall not "be construed to prevent an accumulation of days of rest when the nature of the employment reasonably requires that the employee work seven or more consecutive days, if in each calendar month the employee receives days of rest equivalent to one day's rest in seven." (*Id.*, subd. (a).) Second, the day of rest guarantee does not apply "when the total hours of employment do not exceed 30 hours in any week." (§ 556.)

Gordon contends the statutory weekly overtime rules explain how employees are to be compensated in instances when one or another exception to the day of rest guarantee applies. We agree. In other words, employees are generally assured a day of rest, but when circumstances dictate forgoing a day of rest, section 510 provides, as a fallback, consideration for the hardship in the form of premium pay. (Cf. IWC wage order No. 7–2001, subd. 3(A) [providing premium pay for seventh-day work].)

If this is so, then section 510 reasonably should ensure premium pay for every worked seventh day that is an exception to the day of rest guarantee. No reason appears to think the Legislature would have wanted or intended to discriminate between different employees deprived of a section 551/552 day of rest. Notably, section 510 expressly affords premium pay only for "the seventh day of work in any one *workweek*." (§ 510, subd. (a), italics added.) That is,

11

premium pay is available not on a rolling basis, for any seventh consecutive day of work, but only for employees who must work every day of an employer's established regularly recurring workweek. (See § 500, subd. (b).) The logical inference is that the Legislature views only a seventh day of work during an established workweek as an exception to sections 551 and 552, and intends the day of rest guarantee to apply on a weekly basis. The contrary interpretation, that the day of rest guarantee applies on a rolling basis, would mean the Legislature intended some employees denied a day of a rest to receive premium pay, but not others, based on the fortuity of how their work schedules fell in relation to the employer's established week.[6] We find such a possibility unlikely, when compared with the alternate explanation that the Legislature simply does not consider seven consecutive days of work spread over consecutive workweeks a hardship the day of rest statutes were intended to protect against.

The wording of the part-time employee exception supports a similar inference. No day of rest need be given an employee working 30 hours or less "in any week." (§ 556; see § 500, subd. (b) [defining " 'week' " as a recurring seven-day period "starting [on] the same calendar day"].) If the day of rest guarantee, like this exception, applies on a weekly basis, the exception's application is straightforward. But if the rest guarantee applies on a rolling basis, then in deciding whether a seventh consecutive day of work is permitted for a part-time employee, one would need to choose whether to count the hours worked during

---

[6]     This is to say nothing of the administrative complexity entailed in tracking seventh-day overtime payments, and even simply seventh-day rest guarantees, under a rolling as opposed to a weekly interpretation. As between two possible constructions, we may infer the Legislature in 1893 would have been more likely to intend the interpretation that would have generated fewer compliance tracking issues for contemporary 19th-century employers.

12

the first week overlapping the beginning of the consecutive days worked, or the hours during the second—possibly not yet completed—week. Neither choice represents a sensible basis for identifying and distinguishing those part-time employees who may go without a day of rest. We need not impute to the Legislature the intent to create such an anomaly when a simpler reading of sections 551 and 552, as also applying on a weekly basis, is available.

Gordon finds telling the portion of section 554 that permits employees to "work seven or more consecutive days" when the nature of the work requires it. (See also IWC wage order No. 7–2001, subd. 3(H) [same].) From this, she infers that in the absence of a work justification, seven consecutive days of work is prohibited, and by implication the day of rest guarantee applies on a rolling basis to any seven consecutive days.

The language Gordon cites was added to the Labor Code in 1941 and eventually to the governing wage order in 2001. (See Stats. 1941, ch. 1264, § 1, p. 3210; IWC wage order No. 7–2001, subd. 3(H).) It represents a relaxation of the one day of rest in seven requirement, which previously admitted as an exception only cases of emergency (see former § 554, enacted by Stats. 1937, ch. 90, p. 205), but now allows for days of rest to shift based on the nature of the work, so long as the ultimate effect is to provide one day's rest out of seven over the course of a month. (§ 554, subd. (a).) The subdivision's requirement that "in each calendar month the employee receives days of rest equivalent to one day's rest in seven" (*ibid.*) essentially means that rest days need not fall on every seventh day and can be spaced out differently in a calendar month, so long as the number of rest days received by the employee amounts to the number of calendar days divided by seven. The practical import of section 554, subdivision (a) is to ensure that an employer does not incur liability (other than for premium pay) if it reasonably requires an employee to work all seven days of a workweek, so long as

the day of rest to which the employee would otherwise be entitled is given to the employee on some other day of the calendar month.  The language of section 554 does not convince us that sections 551 and 552 were intended to protect against seven consecutive days of work on a rolling basis.

### D. Conclusion

We conclude sections 551 and 552, fairly read in light of all the available evidence, are most naturally read to ensure employees at least one day of rest during each week, rather than one day in every seven on a rolling basis.

We are unpersuaded by the concern that this reading of the statutory scheme will permit employers regularly to impose on employees schedules in which they may rest no more than one day in 12.  Section 554 provides employers and employees some latitude, but ensures that over the course of every calendar month an employee must receive "days of rest equivalent to one day's rest in seven." (§ 554, subd. (a).)  If at one time an employee works every day of a given week, at another time shortly before or after she must be permitted multiple days of rest in a week to compensate, and on balance must average no less than one day's rest for every seven, not one for every 12.

We also reject the argument that the general employee-protective thrust of the Labor Code compels us to adopt the interpretation favored by Mendoza and Gordon.  We agree that the remedial purposes of the wage and hour laws require they " 'not [be] construed within narrow limits of the letter of the law, but rather are to be given liberal effect to promote the general object sought to be accomplished.' " (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702; see *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at pp. 1026–1027.)  Examination of that object, however, reveals the Legislature intended to ensure employees, as conducive to their health and well-being, a day of rest each week, not to prevent them from ever working more than six

14

consecutive days at any one time.  We interpret the Labor Code's provisions accordingly.

II. *Section 556: How Does the Six-hour Day Exception Apply?*

We consider next an exception to the day of rest rules Nordstrom seeks to apply here.  Section 556 provides: "Sections 551 and 552 shall not apply to any employer or employee when the total hours of employment do not exceed 30 hours in any week or six hours in any one day thereof."  Nordstrom argues that under this provision, so long as an employee is given at least one day with no more than six hours' work during a one-week period, he or she may be required to work all seven days, without a day of rest.  The district court agreed.  Mendoza and Gordon argue the elimination of seventh-day-rest protection applies only to employees who work no more than six hours each and every day of the given week.  We conclude Mendoza and Gordon are correct.

The meaning of section 556 becomes evident when we apply two related interpretive principles.  First, statutory language is to be understood in context, with the whole of a statute considered when attempting to construe each part.  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 315; *Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1261; *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 903.)  Second, the Legislature does not engage in idle acts, and no part of its enactments should be rendered surplusage if a construction is available that avoids doing so. (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1253; *People v. Arias* (2008) 45 Cal.4th 169, 180; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 931.)

Here, the Legislature has enacted two interrelated limits on day of rest protections.  One, a weekly limit, relates to employees who work 30 hours or less. The other, a daily limit, relates to employees who work six hours or less.  Both must be given effect; that is, we must adopt a construction that gives each limit a

15

role in identifying the universe of workers who are otherwise sufficiently protected to not need a mandatory day of rest.

We observe first that the text of the daily limit, taken alone, is ambiguous. The exception applies to employees who "do not" work in excess of "six hours in any one day" of a one-week period. Nordstrom's reading of "any one" to mean "at least one," and Mendoza's and Gordon's reading of "any one" to mean "each one," are both grammatically permissible. Consider the statements (1) "Overtime shall be due an employee who works in excess of 40 hours in any one week" and (2) "No overtime shall be due an employee who does not work in excess of 40 hours in any one week." "Any one" means "at least one" in the first phrase, but "each" or "every" in the second phrase.

We observe next that the double-negative syntax of section 556 also leaves unclear whether its weekly and daily exceptions are conjunctive or disjunctive. Can an employee whose work schedule satisfies either exception be asked to work a seventh day, or only one whose schedule satisfies both? The provision could be read as applying to employees who work either 30 hours or less in a week or six hours or less in a day (the disjunctive reading), or to employees who work neither more than 30 hours in a week nor more than six hours in a day (the conjunctive reading).

Though the parties brief the question, the Ninth Circuit has not asked us to address whether section 556's exceptions should be read disjunctively or conjunctively. Nor need we do so in order to explain the meaning of the daily limit. Under either the conjunctive or the disjunctive reading, Nordstrom's proposed interpretation renders one of the Legislature's two exceptions superfluous, while Mendoza and Gordon's proposed interpretation gives effect to both. Accordingly, Mendoza and Gordon's reading must be the one the Legislature intended.

16

Consider first Nordstrom's interpretation under a disjunctive reading of the statute: excepted from seventh-day protection are employees who work 30 hours or less weekly, or six hours or less on at least one day. Under this reading, the daily limit serves no function. An employee who works no more than 30 hours in a seven-day period averages less than 4.3 hours per day and necessarily will have had at least one day of six hours or less; to so require expressly is wasted text. Consider next Nordstrom's interpretation under a conjunctive reading of the statute: excepted from seventh-day protection are employees who work 30 hours or less weekly, and six hours or less on at least one day. Now, it is the weekly limit that is rendered meaningless. Any employee who does not have even one daily shift of six hours or less in the course of a week will necessarily have worked at least 7 x 6+ hours = more than 42 hours; the weekly limit will never come into play, and section 556's application will depend entirely on whether the daily limit is satisfied. Neither of these readings comports with basic principles of statutory construction.

Mendoza and Gordon's interpretation of the six-hour limit presents no such difficulties. Under the conjunctive reading, only employees asked to work no more than six hours on any one day, and no more than 30 hours total, may be given a schedule with seven days of work. Both the daily and weekly limit serve a role, as some schedules that involve no more than six hours a day might still require more than 30 hours over the course of the week, while some schedules that involve no more than 30 hours over the week might still include one or more days in excess of six hours. So, too, for the disjunctive reading; although it is less protective of employee welfare, eliminating seventh-day protections for a larger pool of employees, it nevertheless involves no surplusage. Under some schedules, an employee may be asked to work only 30 hours, even if some shifts are longer than six hours, and so fit within section 556's exception. Likewise, under other

schedules an employee, although asked to work more than 30 hours, may have no shifts longer than six hours and similarly fit within section 556. Whether read conjunctively or disjunctively, both the weekly and the daily limit play a role in defining the universe of employees within section 556's exception under the Mendoza/Gordon reading, but not under Nordstrom's reading.

Interpreting the exception to require each day's work last six hours or less, rather than only one, also avoids certain absurdities that would otherwise result. If a single day of six hours or less were enough to eliminate seventh-day-rest protection, an employee could be required to work, for instance, six straight eight-hour days, followed by a single six-hour day, followed by six eight-hour days, followed by a six-hour day, ad infinitum. Each week, the single slightly shortened day would excuse the employer from providing an actual day of rest, and the day of rest statutes would be converted from a guarantee of a complete day of rest to a guarantee of at least one day of no more than six hours of work. The exception would swallow the rule. We have no reason to think that, when adding the 30 hours per week/six hours per day exception, the Legislature intended such a radical revision of the nature of the underlying protection, as opposed to a small relaxation for bona fide part-time employees.

Finally, our interpretation of the exception accords with that of the two main state agencies granted responsibility for wages, hours, and working conditions, the IWC and the DLSE. Since 1952, and continuing to the present day, the IWC has included the six hours daily/30 hours weekly exception in its mercantile industry wage orders. (See, e.g., IWC wage order No. 1–52, subd. 3(a)(2) (Aug. 1, 1952); IWC wage order No. 7–80, subd. 3(F) (Jan. 1, 1980); IWC wage order No. 7–2001, subd. 3(F).) The IWC has explained the purpose and scope of the exception: "The [Wage] Order also provides flexibility by allowing 40 hours to be scheduled any time within 6 days not exceeding 8 hours in a day

18

without overtime, and also 30 hours within 7 days, *not exceeding 6 hours a day*, without overtime." (IWC, Statement as to the Basis for IWC Wage Order No. 7–80 (Revised), subd. 3 (July 1, 1988), italics added.) So long as employees are not asked to work more than six hours in any one day or more than 30 hours in a week, no overtime will be due for seventh-day work.

The DLSE interprets the "six hours or less" daily exception similarly. In 1986, an employer sought the DLSE's advice concerning whether a proposed work schedule would incur overtime liability. Under the schedule, an employee would work 40 hours, with at least some work on each day of the workweek, but with three days of six hours or less. The DLSE explained that the exception based on working six hours or less would not exempt the company from paying overtime for work on the seventh day of the workweek: "In the example you provided, your company would be liable for overtime because the total hours [worked] for the workweek exceed 30 and there are days in which the total hours worked exceed six." (Dept. Industrial Relations, DLSE Opn. Letter No. 1986.12.01 (Dec. 1, 1986) p. 1; see *Kilby v. CVS Pharmacy, Inc., supra,* 63 Cal.4th at p. 13 [treating the DLSE's opinion letters as a useful source of guidance]; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1029, fn. 11 [same].) In the DLSE's view, the six hours daily exception applies only if *every* day involves six hours or less of work.

Consistent with the import of the complete text of section 556 and the views of the relevant state agencies, we conclude the "six hours or less" daily exception is satisfied only if every daily shift that week has entailed six hours or less of work.

III.    *Section 552: The Meaning of "Cause"*

Section 552 provides that an employer may not "cause his employees to work more than six days in seven." Mendoza and Gordon contend whenever an

19

employer allows, suffers, or permits an employee to work a seventh day, it has caused the employee to do so.  Nordstrom argues that unless the employer requires, forces, or coerces seventh-day work, it has not caused the employee to work.  We conclude neither definition is sufficient.  Rather, an employer's obligation is to apprise employees of their entitlement to a day of rest and thereafter to maintain absolute neutrality as to the exercise of that right.  An employer may not encourage its employees to forgo rest or conceal the entitlement to rest, but is not liable simply because an employee chooses to work a seventh day.

We begin with the text and the contemporaneous legal understanding of what it means to "cause" someone to act.  Gordon and Nordstrom agree the first edition of Black's Law Dictionary, published just before the "cause" requirement's 1893 enactment, offers relevant insight.  "Cause" means "[t]hat which produces an effect; whatever moves, impels, or leads."  (Black's Law Dict. (1st ed. 1891) p. 181, col. 2; see Anderson's Dict. of Law (1893) p. 155, col. 2 ["That which produces or effects a result"].)  To cause, in the context of an action by an actor, is to motivate or induce the actor to act.  (1 Standard Dict. of English Language (1894) p. 302, col. 1 [to "cause" is "[t]o lead, induce, make, or compel (one to do something)"]; 2 Oxford English Dict. (2d ed. 1989) p. 1001, col. 2 [tracing to 1400 the understanding of "cause" as "[t]o actuate, move, force, drive (an agent) *to* (some action or emotion)"].)

Nordstrom's proposed understanding of "cause" as extending only to a requirement or the use of force is substantially narrower than this contemporaneous understanding.  It also collides with our duty, given the remedial nature of the Legislature's enactments regulating employee hours and working conditions, to " 'liberally construe[]' " these provisions to promote worker protection.  (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at

p. 1027; accord, *McLean v. State of California* (2016) 1 Cal.5th 615, 626.) One can envision a host of ways in which an employer can, short of requiring or forcing employees to go without rest, still implicitly make clear that doing so will redound to their benefit, or spare them sanction, and thereby motivate or induce employees to work every day. If we confine the interpretation of "cause" to instances of express requirements or compulsions, we condone implied pressure that may nevertheless achieve an employer's desired result, to the detriment of the state's workforce and the long-standing policy in favor of one day's rest in seven.[7]

But that "cause" should be extended to embrace every circumstance in which an employee is allowed or permitted to go without rest does not follow. Then, as now, "cause" has been understood to require some affirmative role in motivating or inducing action, not simply the passive failure to prevent action. It is true that for a century employers have been liable for *wages* for passively suffering or permitting work (see, e.g., IWC wage order No. 5, subd. 1 (Sept. 4, 1917)), but the Legislature chose not to write the obligation to afford a day of rest so broadly (e.g., "an employer shall not suffer or permit an employee to work more than six days in seven"), and forbade only causing an employee to forgo rest.[8] Given this choice of language, we decline to conclude that in section 552 the Legislature attached not only liability for wages, but also criminal liability, to an employer's permitting an employee to work a seventh day. An employer

---

[7] The payment of overtime is not an impermissible employer inducement; it is, instead, simply compliance with a federal- and state-imposed legal obligation. (See § 510; IWC wage order No. 7–2001, subd. 3; 29 U.S.C. § 207.)

[8] In contrast, for example, the IWC *did* select this broader language in issuing protections for women and minors: "No person, firm or corporation shall employ, *or suffer or permit* any woman or minor to work in any mercantile establishment . . . more than six (6) days in any one week." (IWC wage order No. 5 Amended, subd. 8 (June 21, 1919), italics added.)

21

cannot affirmatively seek to motivate an employee's forsaking rest, but neither need it act to prevent such forsaking.

## CONCLUSION

We answer the certified questions as set out on page 2, *ante*, and as amplified by our subsequent discussion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

22

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Mendoza v. Nordstrom, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S224611
**Date Filed:** May 8, 2017

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Knapp, Petersen & Clarke, André E. Jardini and K.L. Myles for Plaintiff and Appellant.

Clark & Treglio, Clark Law Group, R. Craig Clark, James M. Treglio; The Markham Law Firm and David R. Markham for Intervener and Appellant.

Duchrow & Piano and David J. Duchrow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant and Intervener and Appellant.

Littler Mendelson, Julie A. Dunne, Joshua D. Levine and Dawn Fonseca for Defendant and Respondent.

Luke A. Wake for National Federation of Independent Business Small Business Legal Center, CATO Institute, Reason Foundation, Manuel Cosme, Jr., Paul Cramer, Kieth Street, Stacy Antonpoulos, Nathan Foli, Steve Duvernay and Tibor Machan as Amici Curiae on behalf of Defendant and Respondent.

Julie Stahr and Lance C. Cidre for National Retail Federation as Amicus Curiae on behalf of Defendant and Respondent.

Ogletree, Deakins, Nash, Smoak & Stewart and Robert R. Roginson for Employers Group, California Employment Law Council and California Hospital Association as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

K.L. Myles
Knapp, Petersen & Clarke
500 North Brand Boulevard, 20th Floor
Glendale, CA  91203-1904
(818) 547-5000

R. Craig Clark
Clark Law Group
205 W Date Street
San Diego, CA  92101
(619) 239-1321

Julie A. Dunne
Littler Mendelson
501 West Broadway, Suite 900
San Diego, CA  92101-3577
(619) 232-0441