Filed 3/5/18

# IN THE SUPREME COURT OF CALIFORNIA

HECTOR ALVARADO, )
)
      Plaintiff and Appellant, )
)           S232607
      v. )
)      Ct.App. 4/2 E061645
DART CONTAINER CORPORATION )
OF CALIFORNIA, )      Riverside County
)   Super. Ct. No. RIC1211707
      Defendant and Respondent. )
_____ )

In this case, we decide how an employee's overtime pay rate should be calculated when the employee has earned a flat sum bonus during a single pay period. Specifically, we consider whether the *divisor* for purposes of calculating the per-hour value of the bonus should be (1) the number of hours the employee actually worked during the pay period, *including overtime hours*; (2) the number of *nonovertime* hours the employee worked during the pay period; or (3) the number of nonovertime hours that *exist* in the pay period, regardless of the number of hours the employee actually worked. We conclude that the divisor should be the second of these options. We reverse the judgment of the Court of Appeal.

## FACTS AND PROCEDURAL BACKGROUND

Defendant Dart Container Corporation of California is a manufacturer of food service products. Plaintiff Hector Alvarado was employed by defendant as a warehouse associate from September 2010 to January 2012. He is a member of a

SEE CONCURRING OPINION

putative class of employees who, during the period alleged in the complaint, were paid on an hourly basis and who, in addition to their normal hourly wages, received an "attendance bonus" if they were scheduled to work on a Saturday or Sunday, and did so, completing the full work shift. The amount of the bonus was a flat sum of $15 per day of weekend work, regardless of whether the employee worked in excess of the normal work shift on the day in question.

The dispute in this case arises because the attendance bonus must be factored into an employee's regular rate of pay so that the employee's overtime pay rate (generally, 1.5 times the regular rate of pay) reflects all the forms of regular compensation that the employee earned. Defendant's formula for calculating an employee's overtime compensation is as follows.

Step one: Defendant multiplies the number of overtime hours the employee worked in the relevant pay period by the employee's straight time rate (i.e., his or her normal hourly wage rate), thus obtaining the employee's *base* hourly pay for the overtime work. We use the word "base" to refer to the pay the employee is entitled to receive simply because he or she has worked additional hours for the employer, exclusive of any extra amount that must be paid because the work qualifies as overtime.

Step two: Defendant adds (a) the total hourly pay for *nonovertime* work during the pay period; (b) any nonhourly compensation the employee earned during the pay period, including any attendance bonuses; and (c) the base hourly pay for overtime work (from step one, *ante*). The result is the total base pay for the pay period, including base compensation for overtime work. Defendant then divides the total base pay by the total number of hours the employee worked in the pay period, including overtime hours. The result is an hourly rate that defendant considers to be the employee's regular rate of pay for the pay period.

2

Step three:  Defendant multiplies the regular rate of pay (from step two, *ante*) by the total number of *overtime* hours in the relevant pay period, and then divides that amount in half.  The result is what defendant considers to be the overtime *premium*.  We use the word "premium" to refer to the extra amount a worker must be paid, on top of normal pay, because certain work qualifies as overtime.[1]

Step four:  Defendant adds the base hourly pay for overtime work (from step one, *ante*) to the overtime premium (from step three, *ante*) to get the total overtime compensation for the pay period.

Plaintiff favors a different formula for calculating overtime compensation, one that determines regular rate of pay by allocating the attendance bonus only to *nonovertime* hours worked during the relevant pay period.  Plaintiff would first calculate the overtime compensation attributable only to the employee's *hourly wages*, doing so by multiplying the employee's straight time rate by 1.5 and by the number of overtime hours.  Plaintiff would next calculate the overtime compensation attributable only to the employee's *bonus*, doing so by calculating the bonus's per-hour value (based on the number of nonovertime hours worked), and then multiplying that per-hour value by 1.5 and by the number of overtime hours worked.  Plaintiff would then combine the foregoing overtime amounts to

[1]    Defendant's formula assumes a 50 percent overtime premium.  In other words, it assumes that the employee's overtime hours are properly compensated at 1.5 times the regular rate of pay.  As will be discussed in more detail below, California law requires that overtime hours be compensated at 1.5 times an employee's regular rate of pay, stepping up to double the regular rate of pay in cases involving unusually large quantities of overtime.  For the sake of simplicity, this opinion generally assumes an overtime multiplier of 1.5 the regular rate of pay, but it does not intend thereby to suggest that the multiplier of double the regular rate of pay does not apply in cases where an employee has worked sufficient overtime to qualify for the larger multiplier.

obtain the total overtime compensation for the pay period. Plaintiff's formula turns out to be marginally more favorable to employees; the key distinction between the two formulas is whether the bonus is allocated to *all* hours worked, or only to the *nonovertime* hours worked.

In August 2012, plaintiff filed a complaint, alleging that defendant had not properly computed his overtime pay under California law. As amended, plaintiff's complaint alleges the following causes of actions: (1) failure to pay proper overtime, in violation of Labor Code sections 510 and 1194, by not including shift differential premiums and bonuses in calculating overtime wages; (2) failure to provide complete and accurate wage statements, in violation of Labor Code section 226; (3) failure to timely pay all earned wages due at separation of employment, in violation of Labor Code sections 201, 202, and 203; (4) unfair business practices, in violation of Business and Professions Code section 17200 et seq.; and (5) civil penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.).

Defendant moved for summary judgment or, alternatively, for summary adjudication. Defendant argued that even though California law governing overtime wages is more protective of workers than federal law, and even though plaintiff here is relying on California law, the trial court should look, for " 'persuasive guidance' " (*Bell v. Farmers Insurance Exchange* (2001) 87 Cal.App.4th 805, 817), to a federal regulation explaining how to factor a flat sum bonus into an employee's regular rate of pay.[2] The trial court should do so,

---

[2]     The federal regulation provides in relevant part: "Where a bonus payment is considered a part of the regular rate at which an employee is employed, it must be included in computing his regular hourly rate of pay and overtime compensation. No difficulty arises in computing overtime compensation if the bonus covers only one weekly pay period. The amount of the bonus is merely

*(footnote continued on next page)*

4

defendant asserted, because the only California regulation on point is an enforcement policy of the Division of Labor Standards Enforcement (DLSE), and that policy is void for failure to comply with the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.). Defendant went on to argue that its formula for calculating overtime compensation was fully compliant with the relevant federal regulation, and therefore summary judgment was appropriate on all causes of action.

Plaintiff opposed defendant's motion, arguing that the Court of Appeal decision in *Marin v. Costco Wholesale Corp.* (2008) 169 Cal.App.4th 804 (*Marin*) supported his way of calculating overtime compensation. *Marin*, which is discussed in more detail below, concerned how an employer should calculate overtime compensation if it pays its hourly workers a semi-annual longevity bonus. In dictum, the *Marin* court approved the DLSE's method of factoring a flat sum bonus into overtime compensation, which is the same method that plaintiff advocates here. Plaintiff's opposition further argued that even if the DLSE's method is set forth in a void underground regulation — that is, a regulation not adopted in accordance with the APA (see Cal. Code Regs., tit. 1, § 250, subd. (a)) — the trial court should nonetheless follow it because it reflects the DLSE's experience, knowledge, and expertise.

The trial court granted defendant's motion for summary judgment, concluding that there was no valid California law or regulation explaining how to factor a flat sum bonus into an employee's regular rate of pay for purposes of

---

*(footnote continued from previous page)*

added to the other earnings of the employee (except statutory exclusions) and the total *divided by total hours worked . . . .*"  (29 C.F.R. § 778.209(a) (2008), italics added.)

calculating the employee's overtime compensation. The court stated that *Marin*, *supra*, 169 Cal.App.4th 804, was factually distinguishable, and that the DLSE's method of factoring a bonus into overtime compensation was set forth in a void underground regulation. In the absence of any valid California law or regulation on point, the trial court concluded that the relevant federal regulation must be followed, and because defendant's method was compliant with the federal regulation, the court further concluded that there was no basis for any of plaintiff's causes of action.

The Court of Appeal affirmed, adopting the trial court's reasoning, and we then granted review to decide how a flat sum bonus earned during a single pay period should be factored into an employee's regular rate of pay for purposes of calculating the employee's overtime compensation.

## DISCUSSION

## I.

California has a longstanding policy of discouraging employers from imposing overtime work. For nearly a century, this policy has been implemented through regulations, called *wage orders*, issued by the Industrial Welfare Commission (IWC). These wage orders are issued pursuant to an express delegation of legislative power, and they have the force of law. (See *Martinez v. Combs* (2010) 49 Cal.4th 35, 52–57 [setting forth a brief history of the IWC].) The IWC's wage orders originally protected only women and children, but since the 1970s, they have applied to all employees, regardless of gender. (See Stats. 1973, ch. 1007, § 8, p. 2004; Stats. 1972, ch. 1122, § 13, p. 2156; see generally *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700–701.) The specific wage order applicable here is Wage Order No. 1, governing wages, hours, and working conditions in the manufacturing industry, but wage orders covering other industries contain analogous restrictions.

6

Traditionally, Wage Order No. 1 has required the payment of an overtime premium for, among other things, any work in excess of eight hours in a day. In 1998, the IWC modified several wage orders, including Wage Order No. 1, and by doing so it partially eliminated the eight-hour-day rule, thus permitting employers to offer flexible hours within a 40-hour workweek without having to pay an overtime premium. (See IWC Order No. 1-98 Regulating Wages, Hours, and Working Conditions in the Manufacturing Industry <https://www.dir.ca.gov/iwc/Wageorders1998/IWCArticle1.pdf> [as of March 5, 2018].) The Legislature responded swiftly by enacting the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999, and the IWC's wage orders were then modified again, this time to conform to the 1999 act. Thus, the obligation to pay an overtime premium is now found in both statutory law (see Lab. Code, § 510) and in the wage orders of the IWC. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026; *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1084.)

Subject to exceptions that are not relevant here, Wage Order No. 1 provides that an employer is obligated to pay an overtime premium for work in excess of eight hours in a day, 40 hours in a week, or for any work at all on a seventh consecutive day. (IWC Order No. 1-2001 Regulating Wages, Hours and Working Conditions in the Manufacturing Industry, subd. 3 <https://www.dir.ca.gov/iwc/IWCArticle1.pdf> [as of March 5, 2018] (IWC Wage Order No. 1-2001).) Such work must be compensated at 1.5 times the employee's "regular rate of pay," stepping up to double the "regular rate of pay" if the employee works in excess of 12 hours in a day or in excess of eight hours on a seventh consecutive working day. (Cal. Code Regs., tit. 8, § 11010, subd. 3(a)(1).)

As noted, Labor Code section 510 imposes similar requirements.[3]  Thus, for overtime work, an employee must receive a 50 percent premium on top of his or her regular rate of pay, and in some cases, the employee must receive a 100 percent premium.

These requirements are more protective of workers than federal law, which does not require premium pay for workdays in excess of eight hours.  Moreover, it is well settled that federal law does not preempt state law in this area, and therefore state law is controlling to the extent it is more protective of workers than federal law.  (See, e.g., *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 566–568 (*Tidewater*); see also *Morillion v. Royal Packing Company* (2000) 22 Cal.4th 575, 592; *Skyline Homes, Inc. v. Department of Industrial Relations* (1985) 165 Cal.App.3d 239, 250–251 (*Skyline Homes*).)

Significantly, an employee's "regular rate of pay" for purposes of Labor Code section 510 and the IWC wage orders is not the same as the employee's straight time rate (i.e., his or her normal hourly wage rate).  Regular rate of pay, which can change from pay period to pay period, includes adjustments to the straight time rate, reflecting, among other things, shift differentials and the per-hour value of any nonhourly compensation the employee has earned.

---

[3]     Labor Code section 510, subdivision (a) provides:  "Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee.  Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee.  In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee."

Here, the attendance bonus that defendant pays for weekend work is incentive pay for completing a full work shift on a day that is unpopular for working (a Saturday or a Sunday). Nonetheless, it is part of an employee's overall compensation package, and therefore both parties agree that its per-hour value must be determined so that the employee's regular rate of pay — and, derivatively, the employee's overtime pay rate — reflects all the various forms of regular compensation that the employee earned in the relevant pay period. In other words, for the limited purpose of calculating overtime pay, the attendance bonus (which is earned all at once by completing a weekend work shift) is *treated as if* it were earned on a per-hour basis throughout the pay period. The question then arises whether the bonus is treated as if it were earned throughout the *entire* pay period (including any overtime hours), or whether the bonus is treated as if it were earned throughout only the *nonovertime* hours of the pay period. It is this question that lies at the heart of the parties' disagreement.

## II.

Because the question at issue here is expressly resolved in plaintiff's favor by the DLSE's enforcement policy, we must determine at the outset whether the DLSE's enforcement policy is controlling, and that question requires us to consider whether the policy is a void underground regulation, and if it is, whether a court can nonetheless agree with it and follow it.

The DLSE is the state agency charged with enforcing California's labor laws, including the IWC wage orders. (Lab. Code, §§ 21, 61, 95, 98 et seq., 1193.5.) Of course, enforcement of a law, especially an ambiguous law, necessarily requires interpretation of that law, and with the benefit of many years' experience, the DLSE has developed numerous interpretations of California's labor laws, which it has compiled in a series of policy manuals. (See *Tidewater*, *supra*, 14 Cal.4th at p. 562.) We explained in *Tidewater* that the DLSE's policy

9

manuals "reflect[] 'an effort to organize . . . interpretive and enforcement policies' of the agency and 'achieve some measure of uniformity from one office to the next.' The DLSE prepared its policy manuals internally, [however,] without input from affected employers, employees, or the public generally." (*Ibid.*) The most recent version of the DLSE's manual is published online. (See DLSE, The 2002 Update of the DLSE Enforcement Policies and Interpretations Manual (Revised) (April 2017) <http://www.dir.ca.gov/dlse/DLSEManual/dlse_enfcmanual.pdf> [as of March 5, 2018] (DLSE Manual).)

In *Tidewater*, *supra*, 14 Cal.4th 557, this court concluded that an earlier version of the DLSE's manual contained void underground regulations. We noted that "[a] regulation subject to the APA . . . has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' [Citation.]" (*Tidewater*, *supra*, at p. 571.) We concluded that the enforcement policy at issue in *Tidewater* "was expressly intended as a rule of general application to guide deputy labor commissioners on the applicability of IWC wage orders to a particular type of employment. In addition, the policy interpret[ed] the law that the DLSE enforce[d] by determining the scope of the IWC wage orders." (*Id.* at p. 572.) Because "the record d[id] not establish that the policy was, either in form or substance, merely a restatement or summary of how the DLSE had applied the IWC wage orders in the past," it was "a regulation within the meaning of [the APA] and therefore void because the DLSE failed to follow APA procedures" in adopting it. (*Ibid.*)

10

In *Tidewater*, we rejected the argument that interpretative regulations are not subject to APA's requirements because they do not fall within the scope of the term "quasi-legislative," a statutory term that defines the reach of the APA.[4] We noted in that regard that "[a] written statement of policy that an agency intends to apply generally, that is unrelated to a specific case, and that predicts how the agency will decide future cases is essentially legislative in nature even if it merely interprets applicable law." (*Tidewater*, *supra*, 14 Cal.4th at pp. 574–575.) Of course, in making that point, we were not intending to eliminate the distinction between quasi-legislative rulemaking, whereby the agency creates new substantive standards under an express delegation of legislative authority, and interpretive rulemaking, whereby an agency clarifies existing substantive standards set forth in some law or regulation that the agency is called upon to administer. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–12 [emphasizing that distinction] (*Yamaha*).) Rather, we were making the point that a published enforcement policy that selects among several competing interpretations of the law, that functions, in both intent and practice, as a rule that must be followed prospectively, and that is not announced in the context of resolving a specific case fairly fits within the APA's definition of a "regulation" (Gov. Code, § 11342.600 [formerly, Gov. Code § 11342, subd. (g)]). And the formulation of such a policy constitutes essentially legislative, as opposed to adjudicative, agency action.

We were careful in *Tidewater* to delineate certain limits to our holding. We said: "[I]f an agency prepares a policy manual that is no more than a restatement

---

[4] Government Code section 11346 provides that the APA applies to "the exercise of any *quasi-legislative* power conferred by any statute heretofore or hereafter enacted." (Gov. Code, § 11346, subd. (a), italics added.)

11

or summary, without commentary, of the agency's prior decisions in specific cases and its prior advice letters, the agency is not adopting regulations.  [Citation.]  A policy manual of this kind would of course be no more binding on the agency in subsequent agency proceedings or on the courts when reviewing agency proceedings than are the decisions and advice letters that it summarizes." (*Tidewater*, *supra,* 14 Cal.4th at p. 571.)  But "[i]f an issue is important, then presumably it will come before the agency either in an adjudication or in a request for advice.  By publicizing a summary of its decisions and advice letters, the agency can provide some guidance to the public, as well as agency staff, without the necessity of following APA rulemaking procedures."  (*Tidewater*, at p. 576.)

We further concluded, however, that when the APA applies, administrative policies that are not adopted in accordance with its requirements are "void" regulations that are "not entitled to any deference."  (*Tidewater*, *supra*, 14 Cal.4th at p. 577; see *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 649 [reaffirming *Tidewater*]; *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 340 [same]; *Morillion v. Royal Packing Company*, *supra*, 22 Cal.4th at pp. 581– 582 [same]; *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 204 [stating same rule as *Tidewater*]; see also Gov. Code, § 11340.5, subd. (a).)  But "void," in this context, does not necessarily mean wrong.  If the policy in question is interpretive of some governing statute or regulation, a court should not necessarily reject the agency's interpretation just because the agency failed to follow the APA in adopting that interpretation; rather, the court must consider independently how the governing statute or regulation should be interpreted.  "If, when we agreed with an agency's application of a controlling law, we nevertheless rejected that application simply because the agency failed to comply with the APA, then we would undermine the legal force of the controlling law.  Under such a rule, an agency could effectively repeal a controlling law simply by reiterating

12

all its substantive provisions in improperly adopted regulations. . . . *The DLSE's policy may be void* [if adopted in violation of the APA]*, but the underlying wage orders are* not *void. Courts must enforce those wage orders just as they would if the DLSE had never adopted its policy*." (*Tidewater*, at p. 577, italics added.)

In *Yamaha*, decided just 20 months after *Tidewater*, this court further clarified its *Tidewater* holding. Like *Tidewater*, *Yamaha* considered the effect of an interpretive policy that had many of the characteristics of an administrative regulation, but that had not been adopted in accordance with the APA. This court's opinion explained that, historically, the State Board of Equalization (the Board) had prepared " 'annotations,' " which we described as "summaries of opinions by [the Board's] attorneys of the business tax effects of a wide range of transactions." (*Yamaha*, *supra*, 19 Cal.4th at p. 4.) These annotations were "prompted by actual requests for legal opinions by the Board, its field auditors, and businesses subject to statutes within its jurisdiction." (*Ibid*.) At issue in *Yamaha* was the degree of deference, if any, courts should give the interpretations set forth in the annotations. As digests of opinions written by the Board's legal staff in response to inquiries from concerned individuals and institutions, the annotations were essentially restatements of prior agency decisions and advice letters, and therefore they were *not* regulations. (See *Yamaha*, at p. 15; *Tidewater*, *supra*, 14 Cal.4th at p. 571.) But as "brief statements — often only a sentence or two — purporting to state definitively the tax consequences of specific hypothetical business transactions" (*Yamaha*, at p. 5), the annotations functioned very much like the void underground regulations we considered in *Tidewater*.

In *Yamaha*, we concluded that the annotations were " 'entitled to some consideration by the Court.' " (*Yamaha*, *supra*, 19 Cal.4th at p. 15.) We emphasized that "[c]ourts must . . . independently judge the text of the [governing] statute," but in exercising that independent judgment, courts may "tak[e] into

13

account and respect[] the agency's interpretation of [the statute's] meaning," whether "embodied in a formal rule or [a] less formal representation." (*Id*. at p. 7.) We characterized the agency's interpretation of the statute as "one among several tools available to the court," saying that "[d]epending on the context, it may be helpful, enlightening, even convincing," or "[i]t may sometimes be of little worth." (*Id*. at pp. 7–8.) What made the agency's interpretation more, rather than less, persuasive was the extent of the agency's "special familiarity" with the problem at issue, and we expressly extended that principle to interpretations that were not adopted in accordance with the APA. (*Id*. at p. 11.) "It is this 'expertise,' expressed as an interpretation (*whether in a regulation or less formally . . .* ), that is the source of the presumptive value of the agency's views." (*Ibid*., italics added.)

In *Yamaha*, we did not back away from our *Tidewater* holding that interpretations embodied in void underground regulations are "not entitled to any deference." (*Tidewater*, *supra*, 14 Cal.4th at p. 577.) We noted, for example, that when an agency has adopted its interpretation in accordance with the APA, that fact implies "careful consideration by senior agency officials" and "enhance[d] . . . accuracy and reliability," which, taken together, "weigh[] in favor of judicial deference." (*Yamaha*, *supra*, 19 Cal.4th at p. 13.) By contrast, we said that an "interpretive bulletin[]" that was not adopted in accordance with the APA was " 'not controlling.' " (*Id*. at p. 14.) We added, however, that such a bulletin does " 'constitute a body of experience and informed judgment to which courts and litigants may properly resort *for guidance*.' " (*Id*. at p. 14, italics added.) In other words, an agency's underground interpretive regulation should not be afforded any special weight or deference, but it is nonetheless something a court may consider, and assuming the court is persuaded that the agency's interpretation is correct, the court may adopt it as its own. Moreover, the persuasiveness of the agency's

14

interpretation increases in proportion to the expertise and special competence that are reflected therein, including any evidence that the interpretation was carefully considered at the highest policymaking level of the agency. (*Id.* at pp. 11 and 13–14.)

The DLSE responded to our decisions in *Tidewater* and *Yamaha* by revising the DLSE Manual. Among other things, the DLSE noted in an introductory section to its revised manual that *Tidewater* had permitted agencies to publish enforcement policies without concern for APA compliance so long as those policies are merely restatements or summaries of prior decisions and advice letters. (See DLSE Manual, *supra*, § 1.1.3, p. 1-2.) Accordingly, the DLSE added to its manual, where appropriate, references to prior decisions and advice letters that supported the various enforcement policies the manual set forth. (See *id*. at § 1.1.6.1, p. 1-3.) As *Tidewater* explained, policies that are supported by such decisions and advice letters are entitled to the same degree of judicial deference that the underlying decisions or advice letters would receive (*Tidewater*, *supra*, 14 Cal.4th at p. 571), and when such policies reflect the agency's superior experience, knowledge, and expertise, that deference may be considerable (see *Bell v. Farmers Insurance Exchange*, *supra*, 87 Cal.App.4th at p. 815; *Yamaha*, *supra*, 19 Cal.4th at p. 14).

The DLSE did not, however, repudiate enforcement policies that were not supported by prior decisions or advice letters and that were therefore void underground regulations under our holding in *Tidewater*. The DLSE thus implicitly recognized that even void sections of its manual continued to serve the laudable purposes of promoting agencywide uniformity of decision and notifying the public of the agency's interpretations of the law. (See Asimow, *California Underground Regulations* (1992) 44 Admin. L.Rev. 43 [California law should not discourage agencies from adopting and publicizing interpretations of the laws they

15

administer]; cf. Gov. Code, § 11340.5, subd. (a) [strictly prohibiting the issuance, use, or enforcement of underground regulations].)  Agency interpretations set forth in void underground regulations are not entitled to any special judicial deference (*Tidewater*, *supra*, 14 Cal.4th at pp. 576–577), but they may very well be correct (*id*. at p. 577), and the public benefits from knowing them.  Moreover, a court that is exercising its independent judgment should certainly take the agency's interpretation into consideration, having due regard for the agency's expertise and special competence, as well as any reasons the agency may have proffered in support of its interpretation (*Yamaha*, *supra*, 19 Cal.4th at pp. 11 and 14), and if the court is persuaded, it may, of course, adopt the agency's interpretation as its own.  Thus, when an agency like the DLSE sets forth an interpretive policy in a void underground regulation, the deference that the agency's interpretation would normally enjoy is absent, but in its place the agency has its power to persuade.

As noted, the DLSE Manual addresses the precise issue we must decide here.  We must interpret the requirement that an employer pay an overtime premium for work in excess of eight hours in a day, 40 hours in a week, or for any work at all on a seventh consecutive day.  (Lab. Code, § 510; IWC Wage Order No. 1-2001, *supra*, subd. 3 (Cal. Code Regs., tit. 8, § 11010, subd. 3).)  According to both Labor Code section 510 and Wage Order No. 1, such work must be compensated at 1.5 times the "regular rate of pay," stepping up to double the "regular rate of pay" if the employee works in excess of 12 hours in a day or in excess of eight hours on a seventh consecutive day of work.  (*Ibid*.)  For purposes of applying these overtime pay requirements, an employer must factor the per-hour value of a flat sum bonus into an employee's regular rate of pay for the relevant pay period, and it is our task here to decide whether, in calculating that per-hour value, the amount of the bonus is divided by (1) the number of hours the employee actually worked during the pay period, *including overtime hours*; (2) the

16

number of *nonovertime* hours the employee worked during the pay period; or (3) the number of nonovertime hours that *exist* in the pay period, regardless of the number of hours the employee actually worked.

The DLSE Manual addresses that precise question in section 49.2.4.2, saying: "If the bonus is a flat sum, such as $300 for continuing to the end of the season, or $5.00 for each day worked, the regular bonus rate is determined by dividing the bonus by the maximum legal *regular hours worked* during the period to which the bonus applies. This is so because the bonus is not designed to be an incentive for increased production for each hour of work; but, instead is designed to insure that the employee remain in the employ of the employer. . . ." (DLSE Manual, *supra*, §§ 49.2.4.2, p. 49-9, italics added.) Therefore, we must determine whether the foregoing DLSE policy statement is a void underground regulation, as was the DLSE policy statement at issue in *Tidewater*.

The policy satisfies the definition we set forth in *Tidewater* for a regulation that is subject to the APA. It is "intend[ed] . . . to apply generally, rather than in a specific case," and it " 'implement[s], interpret[s], or make[s] specific the law enforced or administered by [the DLSE] . . . .' [Citation.]" (*Tidewater*, *supra*, 14 Cal.4th at p. 571.) Moreover, the policy "predicts how the agency will decide future cases" (*id*. at pp. 574–575), and in that sense, it is intended to influence both the present and future behavior of employers. Finally, the DLSE Manual does not cite any agency decisions or advice letters that support the policy, and it therefore is not merely a restatement or summary of such decisions or advice letters. (*Tidewater*, at p. 571.) Hence, the policy is a regulation, and because, like other portions of the DLSE Manual, it was not adopted in accordance with the APA, it is void. But the DLSE's policy is not necessarily wrong just because it is set forth in a void underground regulation. The policy interprets controlling state law, and that interpretation may be correct.

17

The Court of Appeal erred, therefore, in concluding that there was no state law governing the issue we must decide and that federal law, on that account, applied. The Court of Appeal said: "By not regulating overtime pay on bonuses, the state has in effect left to federal regulation computing overtime on bonuses. . . . This court . . . cannot mandate and enforce compliance with plaintiff's proposed formula . . . , when there is no applicable statute or regulation providing for such a formula. . . . [D]efendant's use of the federal formula is lawful because . . . there is no state law or regulation providing an alternative formula. [¶] . . . [*T*]*here is no law or regulation the trial court or this court can construe or enforce . . . other than the applicable federal regulation . . . .*" (Italics added.)

These assertions are simply incorrect. There *is* state law for the courts to construe and enforce; it is Labor Code section 510 and Wage Order No. 1, both of which require the payment of an overtime premium based on an employee's "regular rate of pay." Irrespective of what the DLSE said in its policy manual, it is the court's task to construe how "regular rate of pay" should be calculated in the circumstances presented here. The DLSE's policy statement addressing that question may be a void regulation, but it is a void *interpretive* regulation, and by its very nature, an interpretive regulation does not create law where none previously existed; rather, it clarifies existing law. In other words, even if the DLSE's policy statement is void, the law it attempted to clarify (i.e., Lab. Code, § 510 and IWC Wage Order No. 1-2001) continues to govern, and it continues to call for interpretation.

Moreover, as discussed, reviewing courts are not obligated to reject the interpretation set forth in the DLSE's void regulation. As an underground regulation, the DLSE's policy is not entitled to any special deference (*Tidewater*, *supra*, 14 Cal.4th at pp. 576–577), but the interpretation embodied in that policy may still be valid. Therefore, so long as we exercise our independent judgment,

18

we may consider the DLSE's interpretation and the reasons the DLSE proffered in support of it, and we may adopt the DLSE's interpretation as our own if we are persuaded that it is correct. (*Tidewater*, at p. 577.) And, in doing so, we may take into consideration the DLSE's expertise and special competence, as well as the fact that the DLSE Manual is a formal compilation that evidences considerable deliberation at the highest policymaking level of the agency. (*Yamaha*, *supra*, 19 Cal.4th at pp. 11 and 13–14.) We turn therefore to the question of how a flat sum bonus should be factored into an employee's regular rate of pay for purposes of applying the state's overtime pay laws.[5]

### III.

Two overarching interpretive principles guide our analysis. First, the obligation to pay premium pay for overtime work reflects a state policy favoring an eight-hour workday and a six-day 40-hour workweek, and discouraging employers from imposing work in excess of those limits. (See *Skyline Homes*, *supra*, 165 Cal.App.3d at p. 254; *Industrial Welfare Com. v. Superior Court*, *supra*, 27 Cal.3d at pp. 701–702.)[6] Second, the state's labor laws are to be

---

[5]     We limit our decision to flat sum bonuses comparable to the attendance bonus at issue here. Other types of nonhourly compensation, such as a production or piecework bonus or a commission, may increase in size in rough proportion to the number of hours worked, including overtime hours, and therefore a different analysis may be warranted, as is discussed further below.

[6]     In the main text, we refer to the state policy discouraging employers from *imposing* overtime work. We recognize, of course, that some employees *desire* overtime work, often because it is compensated at a premium rate. We do not intend our opinion to bar employees from choosing to work overtime when such opportunities are made available. Nonetheless, state policy clearly favors the eight-hour workday and the 40-hour workweek, doing so by requiring employers to pay premium wages for work in excess of those limits, thereby creating an incentive for employers to hire additional workers rather than to increase the hours of existing workers. In other words, the state's policy is not focused solely on ensuring adequate compensation for workers; rather, it is also focused on making

*(footnote continued on next page)*

liberally construed in favor of worker protection. (See, e.g., *Mendoza v. Nordstrom, Inc.* (2017) 2 Cal.5th 1074, 1087; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at pp. 1026–1027; *Industrial Welfare Com. v. Superior Court*, *supra*, 27 Cal.3d at p. 702.) Therefore, in deciding how to factor a flat sum bonus into an employee's overtime pay rate, we are obligated to prefer an interpretation that discourages employers from imposing overtime work and that favors the protection of the employee's interests.

Under Labor Code section 510 and the IWC wage orders, an employee's overtime pay rate is a multiple of his or her "regular rate of pay." Hence, a flat sum bonus must be expressed as a per-hour value if it is to affect the overtime pay rate. In other words, for the limited purpose of calculating the overtime pay rate, a flat sum bonus must be *treated as if* it were earned on a per-hour basis throughout the relevant pay period, augmenting the employee's other hourly wages. Significantly, however, the weekend attendance bonus at issue here is payable even if the employee works no overtime at all during the relevant pay period. It follows, then, that the bonus is properly treated as if it were fully earned by only

---

*(footnote continued from previous page)*

the eight-hour workday and the 40-hour workweek the norm, and making overtime work the exception. This point is reflected, for example, in the uncodified provisions of the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999, which state: "The eight-hour workday is the mainstay of protection for California's working people"; "[n]umerous studies have linked long work hours to increased rates of accident and injury"; "[f]amily life suffers when either or both parents are kept away from home for an extended period of time on a daily basis"; and "the Legislature . . . reaffirms the state's unwavering commitment to upholding the eight-hour workday as a fundamental protection for working people." (Stats. 1999, ch. 134, § 2, p. 1820.)

the *nonovertime* hours in the pay period, and therefore only *nonovertime* hours should be considered when calculating the bonus's per-hour value.

The foregoing point finds support in the plain meaning of the phrase "regular rate of pay." As noted, an employee's regular rate of pay changes from pay period to pay period depending on whether the employee has earned shift differential premiums or nonhourly compensation. Therefore, the word "regular" in this context does not mean "constant." Furthermore, Labor Code section 510 and the IWC wage orders define the *overtime* rate of pay as a multiple of the *regular* rate of pay, thus juxtaposing what is "overtime" and what is "regular." It follows, then, that the word "regular" in the phrase "regular rate of pay" refers to "regular-time" (i.e., nonovertime). (Cf. Lab. Code, § 515, subd. (d)(2) [arguably using the word "regular" synonymously with the word "nonovertime"].) That interpretation implies that when nonhourly compensation is factored into an employee's "regular rate of pay," only nonovertime hours should be considered.

That indeed was the holding of the Court of Appeal in *Skyline Homes*, *supra*, 165 Cal.App.3d 239, which this court expressly approved in *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785, 795. In *Skyline Homes*, the Court of Appeal was asked to decide how, under state law, to calculate overtime pay when an employee is paid a fixed weekly salary and has a "fluctuating workweek," meaning hours that vary from week to week. (*Skyline Homes*, *supra*, 165 Cal.App.3d at p. 243.) More specifically, the question was whether, when calculating regular rate of pay, the employee's weekly salary should be divided by all the hours he or she worked during the relevant workweek, including overtime hours, or whether it should be divided by only the nonovertime hours worked during the workweek.

Relying on federal regulations that interpret federal law, the employer in *Skyline Homes* argued that an employee's weekly salary constituted base

21

compensation for all the hours worked during the week, including overtime hours, and therefore if an employee worked overtime, only the 50 percent overtime premium needed to be added. The employer therefore divided the weekly salary by the total number of hours worked during the week, including overtime hours, thus determining a regular rate of pay for the employee, and the employer then divided that regular rate in half and multiplied the result by the number of overtime hours to determine the amount of the 50 percent overtime premium that was owed. Significantly, because the employee's weekly salary was fixed, his or her regular rate of pay decreased, under the employer's method, as the number of overtime hours increased. (See *Skyline Homes*, *supra*, 165 Cal.App.3d at pp. 245–246.)

Two employees challenged the employer's method of calculating overtime compensation, and the DLSE upheld their claim. These employees argued that their weekly salaries were compensation only for the *nonovertime* hours that they worked, and therefore that the employer needed to pay both overtime base compensation and overtime premium to fully compensate them for the overtime hours that they worked. These employees further asserted that the employer should divide an employee's weekly salary by 40 (the number of *nonovertime* hours in a workweek) to determine the employee's regular rate of pay, and that the employer should then multiply that regular rate of pay by 1.5 and by the number of overtime hours to determine the amount of overtime compensation that was due. (See *Skyline Homes*, *supra*, 165 Cal.App.3d at pp. 245–246.)

The Court of Appeal in *Skyline Homes* rejected the employer's method, agreeing with the employees that the regular rate of pay should be determined by dividing the weekly salary by the number of nonovertime hours. The court reasoned that the weekly salary was intended as compensation for the regular 40-hour workweek; it was not intended as compensation for time worked in excess of

22

40 hours in a week. Therefore, the weekly salary divided by the number of nonovertime hours yielded the employee's regular rate of pay, which then needed to be multiplied by 1.5, not by 0.5, because the employer owed both overtime base compensation and overtime premium. The resulting overtime pay rate (i.e., 1.5 times the employee's regular rate of pay) next needed to be multiplied by the number of overtime hours to get the amount of overtime compensation that was due. (*Skyline Homes*, *supra*, 165 Cal.App.3d at 250.)

The court expressly disagreed with the employer's argument that the IWC had modeled state law on federal law, and that therefore the IWC intended to adopt the federal interpretation of how regular rate of pay should be calculated. The court noted in this respect that the state's wage order was more protective of workers than was the federal law, and that the purpose of state law was to discourage overtime in any *day*, not just in any week. The employer's method, under which the worker's regular rate of pay decreased as the number of overtime hours increased, did not fulfill that purpose. (*Skyline Homes*, *supra*, 165 Cal.App.3d at pp. 247–249.) As noted, this court in *Ramirez v. Yosemite Water Co., Inc.*, *supra*, 20 Cal.4th at page 795, expressly approved the foregoing holding of *Skyline Homes*.[7]

---

[7]     *Skyline Homes* also relied, in part, on a DLSE enforcement policy that supported the employees' method of calculating overtime. The court gave that policy "great weight," saying that "unless it is clearly unreasonable, it will be upheld." (*Skyline Homes*, *supra*, 165 Cal.App.3d at p. 249.) The court expressly *rejected* the argument that the DLSE's policy was void for not having been adopted in accordance with the APA. (*Skyline Homes*, at p. 253.) The latter holding of *Skyline Homes* was disapproved by this court in *Tidewater*, but *Tidewater* did not otherwise reject any of the reasoning of *Skyline Homes* (*Tidewater*, *supra*, 14 Cal.4th at p. 573), and, as noted, this court expressly approved the broader holding of *Skyline Homes* in *Ramirez v. Yosemite Water Co., Inc.*, *supra*, 20 Cal.4th at page 795.

23

Moreover, after *Skyline Homes* was decided, its formula for calculating the regular rate of pay in the case of a fluctuating workweek with a fixed weekly salary was codified as Labor Code section 515, subdivision (d). That subdivision provides: "(1) For the purpose of computing the overtime rate of compensation required to be paid to a nonexempt full-time salaried employee, the employee's *regular hourly rate shall be 1/40th of the employee's weekly salary.* [¶] (2) Payment of a fixed salary to a nonexempt employee shall be deemed to provide compensation *only for the employee's regular, nonovertime hours*, notwithstanding any private agreement to the contrary." (Italics added.)[8] Thus, the Legislature expressly endorsed the principle that flat sum nonhourly compensation should be factored into an employee's regular rate of pay by dividing the flat sum by the number of *nonovertime* hours that exist in the relevant period, and that the flat sum compensates the worker for only nonovertime hours worked. In light of the Legislature's clear endorsement of the Court of Appeal's holding in *Skyline Homes*, we conclude that the reasoning of *Skyline Homes* should be applied here.

*Skyline Homes* is, however, ambiguous in one respect. It is not clear from the opinion whether the divisor for purposes of calculating the per-hour value of a weekly salary should be the number of nonovertime hours *actually worked* by the employee in the workweek in question, even if that number is less than 40, or whether it should be 40 (i.e., the number of nonovertime hours *that exist* in a workweek). In codifying the holding of *Skyline Homes*, the Legislature adopted

**8** Section 515, subdivision (d)(1) was added to the Labor Code as part of the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999. (Stats. 1999, ch. 134, § 9, p. 1824.) Subdivision (d)(2) was added in 2012. (Stats. 2012, ch. 820, § 2.)

24

the latter rule.  (Lab. Code, § 515, subd. (d)(1) ["the employee's regular hourly rate shall be 1/40th of the employee's weekly salary"].)  But the opinion in *Skyline Homes* is less clear.

In two places, the opinion refers to a divisor of "*no more* than 40" (*Skyline Homes*, *supra*, 165 Cal.App.3d at p. 245, italics added), thus implying that if an employee works *fewer* than 40 hours in a week (but still works overtime on some days), the divisor for calculating the per-hour value of the weekly salary should be the number of nonovertime hours *actually worked* in the workweek in question. (Cf. *id*. at p. 254 [discussing a possible divisor of 39 hours, but not expressly approving it].)  By contrast, in discussion of a hypothetical example that appears on pages 248 to 249 of the *Skyline Homes* opinion, the court consistently used a divisor of 40 even though the employee in the hypothetical worked only 32 nonovertime hours in one of the two weeks discussed.  It might be that the court's use of 40 as the divisor in this hypothetical was intended to reflect an unstated holding of the court, or it might be that it was merely an inadvertent error.**9**

As noted, the Legislature, in codifying the holding of *Skyline Homes*, adopted 40 as the divisor for all cases (Lab. Code, § 515, subd. (d)(1)), but where,

---

**9**     In this respect, it is worth noting that the court made a minor calculation error in its hypothetical, applying an overtime pay rate of $3.12 instead of $13.12 when calculating the total overtime pay for seven hours of overtime.  (*Id*. at p. 248 ["The time and a half rate would be $13.12 . . . ."]; *id*. at p. 249 ["[T]he employee would be entitled to . . . 7 hours at time and one-half or a total of $21.84 in overtime"; note:  $21.84 is seven times $3.12, not seven times $13.12].)  That minor calculation error suggests that the court may not have been attentive to detail in analyzing its hypothetical, which supports the argument that the court's use of the divisor of 40 in the hypothetical may *also* have been error, and that the court intended the divisor to be the number of nonovertime hours actually worked, as is implied by its use of the phrase "*no more* than 40" (*id*. at p. 245, italics added).

25

as here, the issue involves a flat sum bonus for weekend work, not a weekly salary, there are strong reasons supporting the alternative rule — that is, that the divisor should be the number of nonovertime hours actually worked. Consider, for example, the case of an employee who earns $15 per hour and who works *only on Saturdays*. Most weeks, this employee works just eight hours, but some weeks he is asked to stay late, and he earns overtime pay. And, like every other Saturday employee, he earns a $15 attendance bonus by completing his weekend work shift, thus earning an extra $30 in each two-week pay period. If, when calculating this part-time employee's overtime pay rate, his employer were to divide the amount of the $30 bonus by 80 hours (i.e., the number of nonovertime hours *that exist* in the two-week pay period), then this employee would have good reason to object. He continues in his employment, rather than looking for an alternative job, because the job pays him $270 for two days' work ([16 hours x $15/hour] + a $30 bonus), and he considers that amount to be fair compensation. From his perspective, then, his regular rate of pay is $16.875 per hour. On what basis — he would ask — can his employer divide his $30 bonus by 80 hours, as if he were an ordinary full-time employee, thus sharply diluting his regular rate of pay and his overtime pay rate? For him, the per-hour value of the $30 bonus is $1.875, but his employer treats it as if it were a fifth of that amount.

We can discern no basis for holding that the per-hour value of a flat sum bonus should be calculated as if a part-time employee were actually working a full-time schedule, thus dramatically reducing the overtime pay rates of part-time employees in California. Such a rule would contradict the principle that our state's labor laws must be liberally construed in favor of worker protection. (See, e.g., *Mendoza v. Nordstrom, Inc.*, *supra*, 2 Cal.5th at p. 1087; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at pp. 1026–1027.) Nor would we be furthering this state's policy of discouraging the imposition of overtime work (see

*Skyline Homes*, *supra*, 165 Cal.App.3d at p. 254; *Industrial Welfare Com. v. Superior Court*, *supra*, 27 Cal.3d at pp. 701–702) if we were to permit employers to dilute the value of the flat sum bonuses that their part-time employees earned, fictionally treating those bonuses as if the part-time employees were working full-time schedules.

It is true that under this interpretation, the per-hour value of a flat sum bonus will be lower for a full-time employee than for a part-time employee, but that disparity is simply in the nature of what a flat sum bonus is. If both the part-time and the full-time employees do the work that is required to earn the bonus, then both are entitled to receive the bonus, and all other things being equal, the bonus will necessarily make up a larger share of the part-time employee's overall compensation than it does of the full-time employee's overall compensation. That is not unfair, but it will mean that the part-time employee has a higher regular rate of pay and therefore earns overtime pay at a higher pay rate.

Thus, there is a strong argument that the number of nonovertime hours actually worked in a pay period should be the divisor when calculating the per-hour value of a flat sum bonus. Moreover, that interpretation may have been the original intent of the IWC even as regards a fixed weekly salary. The DLSE Manual, discussing how to factor a fixed weekly salary into regular rate of pay for purposes of calculating the overtime pay rate, quotes from unspecified 1963 "Findings" of the IWC, which state: "It was the Commission's intent that in establishing the regular rate of pay for salaried employees the weekly remuneration is divided by *the agreed or usual hours of work* exclusive of daily hours over eight." (DLSE Manual, *supra*, § 48.1.4, p. 48-2, fn. *, italics added.)

27

The phrase "agreed or usual hours of work" strongly implies that nonovertime hours actually worked, not 40, was the divisor the IWC originally intended.[10]

With respect to fixed weekly salaries — the specific issue addressed in *Skyline Homes*, *supra*, 165 Cal.App.3d 239 — the question is definitively settled by Labor Code section 515, subdivision (d). In that context, the divisor is 40, not the number of nonovertime hours actually worked. But in extending the holding of *Skyline Homes* to a flat sum bonus like the attendance bonus at issue here, we are not obligated to adopt 40 as the divisor, and we can hold instead, consistent with the apparent original intent of the IWC, that the divisor is the number of nonovertime hours actually worked in the relevant pay period.

Moreover, although we do not defer to the DLSE's enforcement policy, we do consider it to the extent we find it persuasive, keeping in view the DLSE's expertise and special competence, as well as the fact that the DLSE Manual evidences considerable deliberation at the highest policymaking level of the agency. (*Yamaha*, *supra*, 19 Cal.4th at pp. 11 and 13–14.) Therefore, we find it significant that the DLSE has adopted an interpretation of regular rate of pay that treats a flat sum bonus in the same manner as the salary at issue in *Skyline Homes*, *supra*, 165 Cal.App.3d 239, but uses the "maximum legal *regular hours worked during the period*" (not the hours that *exist* in the period) as the divisor when calculating the bonus's per-hour value. (DLSE Manual, *supra*, § 49.2.4.2, p. 49-9, italics added.)

In its manual, the DLSE also explained why overtime hours should *not* be included in the divisor, saying: "If the bonus is a flat sum, such as . . . $5.00 for

---

[10]    Certainly, the word "agreed" carries that implication, and the word "usual" was probably included to cover the situation of a tacit agreement based on customary practice.

28

each day worked," only nonovertime hours should be considered "because the bonus is not designed to be an incentive for increased production *for each hour of work*; but, instead is designed to insure that the employee remain in the employ of the employer." (DLSE Manual, *supra*, § 49.2.4.2, p. 49-9, italics added.) We think the DLSE identifies an important distinction that is relevant to this case. If a bonus is a reward "for each hour of work," and its amount therefore increases in rough proportion to the number of hours worked (as might be true of a production or piecework bonus or a commission), then it might be said that the payment of the bonus itself constitutes base compensation, including base compensation for overtime work, in which case one might be able to argue that only the overtime premium need be added. But the attendance bonus at issue here does not reward the employee "for each hour of work," and its amount does not increase in rough proportion to the number of hours worked; rather, it is a flat sum bonus that rewards the employee for completing a full weekend shift. As such, it is more like the salary at issue in *Skyline Homes* than it is like an hourly wage. But because the amount of the bonus is not tied to the number of hours worked, its per-hour value will necessarily be larger for an employee who works less than 40 hours in a particular workweek, resulting in a larger overtime pay rate. That circumstance is built into the very nature of a flat sum bonus, and therefore it is not unfair to employees who work full-time schedules.

Accordingly, we conclude — consistent with DLSE's policy on point — that the divisor for purposes of calculating the per-hour value of defendant's attendance bonus should be the number of nonovertime hours *actually worked* in the relevant pay period, not the number of nonovertime hours that *exist* in the pay period.

Defendant tries to distinguish *Skyline Homes*, *supra*, 165 Cal.App.3d 239. Defendant argues that the attendance bonus at issue here is different from the

weekly salary at issue in *Skyline Homes*, because plaintiff here is an hourly worker receiving a bonus, not a salaried worker. We find the distinction to be irrelevant. To the extent of the attendance bonus, plaintiff is similarly situated to a salaried worker. Suppose, for example, an employer paid its highly skilled hourly employees the minimum wage, but it also paid those employees a weekly flat sum bonus that was the larger portion of their earnings. If that bonus were not treated in the same way as the salary at issue in *Skyline Homes*, then employers could circumvent the holding of *Skyline Homes* — and also Labor Code section 515, subdivision (d) — merely by converting a salary into minimum hourly compensation with a bonus.

It is true that a weekly salary is subject to Labor Code section 515, subdivision (d), and therefore under this court's holding, a flat sum bonus will be treated slightly differently from a fixed weekly salary in the case of an employee who works fewer than 40 hours in a week. But defendant's formula — using total hours, including overtime hours, as the divisor when determining the per-hour value of a flat sum bonus — must be rejected because it results in a progressively decreasing regular rate of pay as the number of overtime hours increases, thus undermining the state's policy of discouraging overtime work. In short, the same considerations that supported the court's decision in *Skyline Homes* apply just as persuasively here. (See *Skyline Homes*, *supra*, 165 Cal.App.3d at p. 246 [noting that under the employer's method of calculating overtime, each additional hour of overtime eroded the employee's pay rate].)

Defendant also argues that the holding in *Skyline Homes* turned on preserving the distinction between California and federal law, and that it therefore applies only to cases in which an employee works less than 40 hours in a workweek but more than eight hours in a day. Defendant's narrow reading of *Skyline Homes* is drawn from the hypothetical example that the *Skyline Homes*

30

court used in the course of its analysis.  (*Skyline Homes*, *supra*, 165 Cal.App.3d at pp. 248–249.)  The court made the point that under the employer's method of calculating overtime (which was the same as the federal method), there might be instances — illustrated by the court's hypothetical example — in which a worker worked more than eight hours in a day but received no overtime premium pay because he or she worked less than 40 hours in the week.  That possibility, the court said, would undermine the state's policy favoring an eight-hour workday.  (*Ibid*.)  But the court never suggested that its holding was limited to cases that were like the hypothetical example, and the claim brought by the workers in *Skyline Homes* was not, in fact, so limited.  (*Id*. at p. 244.)

It might be argued that defendant's attendance bonus is different from other types of flat sum compensation because the bonus rewards only *weekend* work.  According to this reasoning, overtime work done on a *weekday* (i.e., Monday through Friday) should not increase the size of the attendance bonus, because the bonus has no relation to weekday work.  This argument, however, misunderstands what regular rate of pay is.  Not all employees earn at a fixed pay rate throughout a pay period, and therefore regular rate of pay is a *weighted average* reflecting work done at varying times, under varying circumstances, and at varying rates.  (See Lab. Code, § 246, subd. (*l*)(1) [referring to "the regular rate of pay for the workweek"]; see also DLSE Manual, *supra*, § 49.2.5, p. 49-10 [setting forth the DLSE's "Weighted Average Method" for calculating regular rate of pay when worker has varying pay rates]; 29 C.F.R. § 778.115 (2008) [setting forth the federal "weighted average" policy].)  Thus, it is often the case that overtime worked during a low-paying shift is compensated based on an overtime pay rate that reflects, as part of a weighted average, higher pay rates earned during higher-paying shifts.

In light of this averaging of regular rate of pay across the entire length of the relevant pay period, it is not surprising that the value of a weekend attendance bonus should also be averaged across the entire pay period, even though, like a weekend shift differential, it is offered as a reward for work done only on the weekend. Hence, there is nothing improper in the fact that weekday overtime will effectively increase the size of the weekend attendance bonus. The attendance bonus must not be viewed in isolation; rather, it is a component of the employee's regular rate of pay for the entire pay period, and overtime worked at any point during the workweek must, by law, be compensated at a multiple of that regular rate of pay.

Defendant relies on *Marin*, *supra*, 169 Cal.App.4th 804, for the proposition that its attendance bonus, like the bonus at issue in *Marin*, does not operate in practice to encourage the imposition of overtime work.[11] In *Marin*, the employer paid a bonus every six months, in graduated amounts, based on the longevity of a worker's employment with the company. To qualify for the full bonus, the worker had to work a minimum of 1,000 hours during the relevant six-month period (i.e., full time), and if the worker worked less than 1,000 hours, the bonus was prorated. The *Marin* court concluded that although the bonus had "some of the characteristics of a 'flat sum' bonus on hours exceeding 1,000," it functioned "for the most part like a production bonus," with each hour of work increasing the amount of the bonus. (*Marin*, at p. 816.) Therefore, in calculating the additional overtime compensation that was payable because of the bonus, the amount of the bonus had to be divided, in the court's view, by the total number of hours worked, including overtime hours, and that per-hour value then had to be multiplied by 0.5

---

[11] As noted, plaintiff is the party that puts primary reliance on *Marin*.

(not 1.5) and by the number of overtime hours. (*Ibid*.) The court concluded that the per-hour value of the bonus had to be multiplied by 0.5 (not 1.5) because it was only necessary for the employer to pay the 50 percent overtime premium that was attributable to the bonus. (*Id*. at p. 817.)

The *Marin* court conceded that the longevity bonus functioned as a flat sum bonus if the worker worked *more* than 1,000 hours, because at that point, the amount of the bonus became fixed, and therefore its per-hour value decreased as the number of hours worked increased. But even then, the employer's method of calculating overtime compensation did not, according to the court, "encourage[] imposition of overtime." (*Marin*, *supra*, 169 Cal.App.4th at p. 818.) Therefore the court concluded that there was no rationale for adopting the formula proposed by the plaintiffs in that case. (*Id*. at pp. 817–819.)

Here, defendant argues that its attendance bonus, like the longevity bonus at issue in *Marin*, does not encourage the imposition of overtime. Defendant is wrong. According to defendant's formula, the attendance bonus is a fixed amount, and therefore the per-hour value of the bonus decreases (as does the employee's overtime pay rate) as the number of overtime hours the employee works increases. Thus, the disincentive created by Labor Code section 510's requirement of overtime premium pay is, to a small extent, lessened in the case of employees who qualify for the bonus. That lessening of the disincentive is inconsistent with the state's policy of discouraging overtime.

Defendant disagrees with the foregoing analysis, arguing that its attendance bonus actually advances the state's policy of discouraging overtime. It does so by ensuring that employees report for, and complete, their scheduled weekend work shifts, thus making it unnecessary to ask some employees to work overtime to cover for other employees who fail to show up or who leave early. The reasoning is obviously flawed. If normal pay rates do not provide sufficient motivation to

33

cause employees show up for weekend work shifts, then the solution is not to pay overtime pay rates to the few employees who do show up; the solution is to increase the weekend pay rates for all employees, and that, in effect, is what the attendance bonus does. Thus, the attendance bonus is simply one component of an employee's total compensation, and it must be factored into the employee's regular rate of pay in such a way that the overtime pay rate remains constant, rather than decreasing incrementally with each additional hour of overtime. Defendant is arguing, in effect, that we should tolerate a decreasing overtime pay rate because otherwise employers will pay under-market wages and will be forced, because of the resulting no-shows, to impose more overtime. The argument has no merit. Regardless of how well an employer chooses to compensate its weekend workers, it must pay a full overtime pay rate, not one that decreases with each additional hour of overtime.

Defendant further argues that even if an employee who receives the attendance bonus will have a slightly decreasing overtime pay rate as the number of overtime hours increases, the employee's overtime pay rate will still be more than it would have been if the attendance bonus had not been paid at all, because under its formula the attendance bonus *does* factor into the worker's regular rate of pay, just not as generously as plaintiff would like. Therefore, defendant asserts, the attendance bonus makes overtime work *more* costly for an employer, not less costly, and in that way it serves to discourage the imposition of overtime. This argument, too, misses the mark. Defendant might as well be arguing that overtime is more costly in the case of highly compensated employees, and therefore it need not pay a full 1.5 multiplier in the case of such employees. That is not our law; our law states that as regular rates of pay rise, so do overtime pay rates, proportionally. It is true that defendant's formula still operates to some degree to discourage overtime, but under defendant's formula, the overtime disincentive

34

created by Labor Code section 510 is weakened for an employee who qualifies for the attendance bonus, and that weakening of the disincentive is inconsistent with the state's policy discouraging overtime.[12]

Defendant also asserts that adopting plaintiff's formula for calculating overtime compensation would violate defendant's right to due process of law because ordinary people could never have predicted that the law would be interpreted in the way plaintiff proposes. This argument, too, is meritless. Labor Code section 510 and Wage Order No. 1 state that the overtime pay rate is a fixed multiple of a worker's "regular rate of pay," and both the DLSE and the courts are obligated to liberally construe the phrase "regular rate of pay" so as to protect workers (see, e.g., *Mendoza v. Nordstrom, Inc.*, *supra*, 2 Cal.5th at p. 1087; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at pp. 1026–1027). One very reasonable way to construe "regular rate of pay" is to conclude that in calculating the per-hour value of a flat sum bonus, the bonus is apportioned only over regular-time hours (i.e., nonovertime hours). Thus, defendant is simply

---

[12] The Court of Appeal in *Marin* appears to have made a similar error of reasoning. Under the facts of *Marin*, employees who worked more than 1,000 hours during the six-month period preceding payment of the longevity bonus received a fixed bonus regardless of how many hours they worked. As to them, therefore, the per-hour value of the bonus decreased (as did their overtime pay rate) as the number of hours of overtime increased. Thus, the employer in *Marin* had less of a disincentive to require additional overtime from those employees. The *Marin* court recognized this point (*Marin*, *supra*, 169 Cal.App.4th at p. 818 ["the plan . . . encourage[s] imposition of overtime on those who have reached 1,000 paid hours . . . ."], but the court responded by pointing out that the plan likewise encouraged the imposition of overtime on those who were relatively recent hires and who therefore did not qualify for the bonus at all (*ibid*.). That answer, however, did not address the problem. It remained true that the disincentive created by Labor Code section 510's requirement of overtime premium pay was, to a small extent, lessened in the case of full-time employees who qualified for the longevity bonus and who worked overtime.

35

wrong when it argues that ordinary people could not have predicted plaintiff's interpretation, and that it would violate defendant's due process rights to adopt that interpretation. In fact, the interpretation was published in the DLSE Manual, and so defendant had every reason to predict it.

At oral argument, defendant's counsel urged that if we rule for plaintiff, our holding should be given prospective application only. We recently noted in *Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1282, that fairness and public policy sometimes weigh against the general rule that judicial decisions apply retroactively. Prospective application might be appropriate, for example, " ' "when a judicial decision changes a settled rule on which the parties below have relied." ' " (*Ibid.*) In this regard, the reasonableness of the parties' reliance and the effect retroactivity will have on the administration of justice are key considerations. (*Ibid.*) Defendant's counsel argued that, if applied retroactively, a holding in plaintiff's favor will force employers all over the state to pay costly civil penalties. Counsel attempted to cast defendant in a sympathetic light, stating that defendant reasonably followed a federal regulation that was directly on point, doing so because in *Tidewater*, *supra*, 14 Cal.4th at page 572, this court had declared the relevant state regulations to be void. But defendant must not have read *Tidewater* very carefully, because if it had done so, it would have seen that although the DLSE's enforcement policies may, in some cases, be void underground regulations, they may nonetheless be accurate interpretations of binding state law. (*Tidewater*, at p. 577.) Moreover, it is *defendant's* interpretation of Labor Code section 510 and Wage Order No. 1, not the DLSE's, that is strained, because defendant's interpretation requires us to read the word "regular" in the phrase "regular rate of pay" as if it somehow did not refer only to regular-time but also to overtime. In short, defendant cannot claim reasonable reliance on settled law. Furthermore, if we were to restrict our holding to

36

prospective application, we would, in effect, negate the civil penalties, if any, that the Legislature has determined to be appropriate in this context, giving employers a free pass as regards their past conduct.  (See Lab. Code, §§ 203, subd. (a), 226, subd. (e), 2699; Bus. & Prof. Code, § 17206.)  In doing so, we would exceed our appropriate judicial role.  Accordingly, we see no basis for limiting our holding to prospective application.

We conclude that the flat sum bonus at issue here should be factored into an employee's regular rate of pay by dividing the amount of the bonus by the total number of nonovertime hours actually worked during the relevant pay period and using 1.5, not 0.5, as the multiplier for determining the employee's overtime pay rate.

### DISPOSITION

The judgment of the Court of Appeal is reversed.

**CHIN, J.**

**WE CONCUR:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**PERREN, J.***

_____

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY CANTIL-SAKAUYE, C. J.**


I concur in the judgment. I agree with the majority that, when calculating a "regular rate of pay" for purposes of setting overtime compensation, Labor Code section 510, subdivision (a) and Industrial Welfare Commission wage order No. 1 (Cal. Code Regs., tit. 8, § 11010, subd. 3(A)(1)) are properly construed as allocating the bonus at issue here only to nonovertime hours actually worked during a pay period. I also agree with the majority's rejection of the request by defendant Dart Container Corporation of California (Dart) for prospective-only application of the court's interpretation of these authorities. As the majority concludes, the presence of a degree of uncertainty regarding a civil statute's meaning does not on its own justify such a limitation. (See *Grafton Partners L.P. v. Superior Court* (2005) 36 Cal.4th 944, 967.) I write separately to explain that some of the uncertainty surrounding the proper calculation of an overtime pay rate in this situation could, and in my view should, have been dispelled long ago.

Prior to today's decision, the spare language of the pertinent state authorities could have left employers that fully intended to comply with state overtime laws somewhat uncertain about how to proceed. Although a policy manual issued by the Division of Labor Standards Enforcement (DLSE) relates what the court determines today to be a correct view regarding state law, the interpretation's placement within this manual, by itself, entitles it to "no weight" (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576

1

(*Tidewater*)) because the DLSE did not promulgate this manual in accordance with the rulemaking provisions of the Administrative Procedure Act (APA; Gov. Code, § 11340 et seq.). Thus there has been no authoritative construction by a state agency of what a "regular rate of pay" entails in this context.

The result is that employees such as plaintiff Hector Alvarado had to sue to assert their right to higher overtime pay, and employers such as Dart may now be faced with substantial penalties. This state of affairs, which is unfortunate for employees and employers alike, conceivably could have been avoided had an interpretative regulation on this subject been promulgated through formal APA rulemaking during the more than two decades that have elapsed since our decision in *Tidewater*, *supra*, 14 Cal.4th 557. An interpretation of a statute posited through such a regulation is accorded greater weight than a view related only in a policy manual (see *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12-13), and would have provided a more robust basis for employers and employees to structure their affairs. Regrettably, more was not done to help employers meet their statutory responsibilities, or to ensure that employees receive the overtime pay they are due.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Alvarado v. Dart Container Corporation of California
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 243 Cal.App.4th 1200
**Rehearing Granted**

_____

**Opinion No.**S232607
**Date Filed:** March 5, 2018
_____

**Court:** Superior
**County:** Riverside
**Judge:** Daniel A. Ottolia

_____

**Counsel:**

Dennis F. Moss; Lavi & Ebrahimian, Joseph Lavi and Jordan D. Bello for Plaintiff and Appellant.

Quintilone & Associates, Richard E. Quintilone II and Alvin B. Lindsay for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Best Best & Krieger, Howard B. Golds and Elizabeth A. Han for Defendant and Respondent.

Manufacturers' Center for Legal Action, Linda E. Kelly, Patrick N. Forrest, Leland P. Frost; Littler Mendelson, Michael J. Lotito and Elizabeth Parry for National Association of Manufacturers as Amicus Curiae on behalf of Defendant and Respondent.

Paul Hastings, Paul W. Cane, Jr., Zachary P. Hutton and Jesse C. Ferrantella for California Employment Law Council and Employers Group as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Dennis F. Moss
15300 Ventura Boulevard, Suite 207
Sherman Oaks, CA  91403
(310) 773-0323

Howard B. Golds
Best Best & Krieger
3390 University Avenue, 5th Floor
Riverside, CA  92502
(951) 686-1450

Zachary P. Hutton
Paul Hastings
101 California Street, 48th Floor
San Francisco, CA  94111
(415) 856-7000