Filed 12/24/24  Fonseca v. Foxman CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| REBECA FONSECA,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>TED FOXMAN et al.,<br><br>        Defendants and Respondents. | B326714<br><br>(Los Angeles County Super. Ct. No. 19STCV38087) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge.  Affirmed.

        Hennig Kramer Ruiz & Singh, Rob Hennig and Samuel Marion Brown for Plaintiff and Appellant.

        Raines Feldman Littrell, Lauren J. Katunich and Matthew Pate for Defendants and Respondents.

        _____

Appellant Rebeca Fonseca worked as a live-in nanny for respondents Ted and Laura Foxman. She sued for labor law violations and conversion after respondents terminated her employment. A jury rejected Fonseca's claims. Judgment was entered for respondents.

Fonseca now challenges the sufficiency of the evidence; the jury instructions; evidence that was admitted or excluded; and the fairness of the trial. We find no error resulting in a miscarriage of justice that would justify reversal of the judgment or granting a new trial. (Cal. Const., art. VI, § 13.) We affirm.

## FACTS

Respondents have four children. Through an agency, they hired Fonseca in mid-August 2016 as a nanny to live in their home Monday to Friday. Her payrate was $900 per week. Respondents did not ask Fonseca to keep a time sheet, or keep a time sheet for her. She spent 27 months in their employ. Her primary responsibility was to supervise respondents' children, making sure they were fed, showered, and properly clothed.

In January 2017, the Foxmans allowed Fonseca's teenage son Max to move into their home. Once she and Max began to live with them seven days a week, respondents paid Fonseca $100 to child sit or help them on weekends. It was not a salary increase. Fonseca testified that she agreed to this arrangement as "a way of showing gratitude to them because Max was living there without paying rent." Renting an apartment for Max would have cost her $1,500 to $1,800 per month.

Max occasionally helped out. For example, he took respondents' child to Universal Studios in 2017; in 2018, he collected a parcel from their front door and drove the children every few months. Respondents paid for his help. Fonseca did

2

not tell Max that respondents failed to pay what she was owed, and he did not recall her ever saying she was racially harassed. Respondents gave Max $300 as a Christmas gift.

The Foxman children were aged eight to 14 when Fonseca went to work for the family. They did not require handholding. The day Fonseca met the family, their teenage daughter made a vulgar comment to Mrs. Foxman. Fonseca was concerned, but chalked it up to adolescent misbehavior. The same child later mocked Fonseca's English.[1] Humiliated, Fonseca complained to Mrs. Foxman, who did not do anything and made racist comments about Latinos. Respondents made Fonseca feel bullied, inferior, and powerless.

On cross-examination, counsel showed that Fonseca never mentioned alleged racial insults in her deposition. Once, when respondents' nine year old was listening to rap music and repeated a pejorative racial term, Max texted Fonseca that Mr. Foxman would "eat [his son] alive" if he heard him use that term. Fonseca told her employment agency that she felt underpaid, but never complained about racial harassment, which would have been noted in her records.

Fonseca said her workday started at 7:00 a.m., preparing simple food for the children. After taking them to school, she ran errands for the family, shopped, took pets to the veterinarian, put gas in their cars, made snacks, and prepared dinner. After doing the dishes, Fonseca helped the children get ready for bed. She was not done until 9:00 or 10:00 p.m. On Fridays, she stayed up

---

[1] On cross-examination, Fonseca agreed that this child honored her by moving her to the front row at a family religious ceremony.

until respondents returned from social outings.  Fonseca claimed she spent five hours daily shopping and preparing dinner, then cleaning up.  She claimed she did not receive meal or rest breaks, and was not paid for all her work time.

Respondents denied Fonseca's claim of working 14-hour days.  Mr. Foxman testified that Fonseca worked a minimal number of hours for her $900 weekly check.  She worked zero hours (if the family was on vacation), and 12 to 20 hours per week when they were home.  Fonseca took the children to school in the morning, then picked them up in the afternoon when classes ended.  She was free to do as she pleased while the children were at school.  Fonseca was not expected to work eight consecutive hours, or more than 40 hours per week.  She was not charged for room and board while living in respondents' home.  She generally retired to her room by 7:30 or 8:30 p.m.

Mrs. Foxman often drove the children to school because she volunteered there, then picked the children up to take them to after-school events.  She hired two Uber drivers to escort the children to evening events.  Respondents testified that Fonseca infrequently did errands for them, which consumed one or two percent of her work time.  Two percent of her time was spent grocery shopping for the family, as opposed to shopping for herself and Max.  She spent less than one percent of her time cleaning because the housekeeper cleaned the entire home, including Fonseca's quarters.

Fonseca occasionally drove the children after school, though Mr. Foxman took his son to after-school sports.  Fonseca and Max had dinner with the family three or four times a week.  Sometimes she cooked, or the family ordered food delivery, or went out to dinner, or respondents prepared dinner.  The family

4

helped clean up after dinner. Fonseca seldom cooked for respondents if she was not partaking in the meal. Fonseca was not asked to stay awake until all the children were in bed.

Fonseca was paid extra for working on weekends. Mr. Foxman testified that Fonseca was paid for more hours than she worked, and never said she was missing pay or owed overtime.

Mrs. Foxman attended college in Mexico, and spoke to Fonseca in Spanish. She loves Latin culture and would never insult Fonseca's accent or heritage. She gave Fonseca all the time off for travel that she requested. She told Fonseca her hours would be flexible because she would work mornings and afternoons, and be free while the children were in school. She wanted Fonseca to be happy.

Fonseca purchased groceries (using respondents' credit card) for Max and herself, and sometimes for the family. Mrs. Foxman did not expect Fonseca to cook for the family, but Fonseca loved to cook and chose to do so. Fonseca was "outspoken" and felt free to tell Mrs. Foxman, on one occasion, that she was owed money for working on a holiday; Mrs. Foxman then gave her an additional $800. That was the only time Fonseca complained.

Fonseca claimed that in the 27 months of her employment, she only had a few 10-minute rest breaks; however, the record showed that she spent 10 to 15 minutes texting with friends during the workday. Fonseca felt that respondents took advantage of her, so that she was not able to spend time with Max, though he was living with her. She claimed she was not paid overtime for working weekends and holidays.

Respondents documented that they paid Fonseca for every day she worked. They paid her extra for working on a weekend.

5

They paid her when she was on vacation. They paid her during extended periods when the family was vacationing. Fonseca went to Mexico eight times in 2018. Out of the 840 days Fonseca worked for respondents, she did not work for 181 days (excluding weekends) because either she or the Foxmans were away on vacation. Respondents gave her time off while she was getting divorced in October 2016, not long after she started working for them, plus time off to attend to other personal matters.

Though Max was a minor, Fonseca felt comfortable going to Mexico and leaving Max with respondents. In February 2017, Fonseca and Max vacationed in Mexico to celebrate his birthday. She falsely told respondents they were going to Mexico because Max was having surgery there and sent Mrs. Foxman text messages about the "surgery." On one of her trips to Mexico, Fonseca called and got respondents' approval to use their credit card to guarantee a rental car for herself.

Fonseca described working for respondents as "slavery" yet agreed that she moved Max into their home and rejected an offer from a potential employer who would pay her $2,500 per week, more than twice what she made at the Foxman home. She explained, "I felt that I was a slave because I had to tell [respondents] all the information of where I was going, what I was going to do." She also felt like a slave because she and her son were unable to use respondents' home as if it were their own.

Documentary evidence showed that Mrs. Foxman asked Fonseca if she was willing to work on weekends, and offered to pay her more for her time. Her paychecks from respondents exceeded $2,000 for two-week pay periods. Fonseca claimed the excess pay was reimbursement for using her own money to pay for respondents' expenses; however, she used respondents' credit

6

card for family expenses.  Apart from paychecks, Mr. Foxman testified that he gave her "thousands" of dollars in cash for doing chores or for working an hour or two on Sunday.

Fonseca claimed that when the Foxmans were out of town, she cared for the dogs and guests, and cleaned the house. However, a housekeeper came daily, and Mr. Foxman testified that Fonseca was "not responsible for cleaning."  Mrs. Foxman denied that Fonseca looked after guests.  Though Fonseca professed to love the Foxmans, she wrote text messages to Max calling the family's children—including the eight-year-old—cruel and insulting names.

Fonseca conceded that respondents took her out for birthdays, gave money to Max, offered to bring her food when they were dining outside the home, paid for meals when she and Max went out with them, and served Max dinner when she was not there.  A Foxman child referred to Fonseca and Mrs. Foxman as "moms."  At Fonseca's request, respondents took her to a party at the home of a celebrity.  When Max was alone in respondents' home in 2018 (while they and Fonseca were out of town) he invited friends over without permission; when Mr. Foxman questioned this, Fonseca encouraged Max to lie and say they were his cousins.

In November 2018, respondents' veterinarian disclosed that Fonseca asked for a certificate to take their dogs to Mexico. Respondents were not planning a trip to Mexico.  Upset that Fonseca planned to leave the country with their pets, they terminated her employment because they no longer trusted her.

Respondents began to pack Fonseca's belongings while she was outside the house.  When they informed her of her termination, she refused to pack, so Mr. Foxman packed the rest

7

of her belongings. Respondents did not accuse her of criminal activity, and later invited her and Max to a meal to give Max a parting gift. Mr. Foxman apologized that things did not work out.

Fonseca said respondents accused her of working for a "cartel" and planning to kidnap their dogs. They packed her belongings, put them in a truck, and gave her a check. They found some items she left behind and returned them, but supposedly did not return her passport, birth certificates, social security card, and $1,000 in Mexican pesos. She did not provide evidence that she applied for replacement documents. Respondents denied keeping anything.

Fonseca testified that she was planning to split her time between Mexico and San Diego.[2] Max lives in Mexico. Fonseca's agency found her a new placement, where she started a few days after leaving respondents' home.

A nanny hired after Fonseca testified that the Foxmans treated her respectfully and never made racist remarks. She always had time for lunch, and they paid extra if they needed help on a Saturday. They did not ask her to stay awake until the children went to sleep. She made breakfast for the children, sometimes drove them to school, went to the market, and fixed dinner two or three times a week. She sometimes stopped at the pharmacy to pick up something for respondents. She had three to five hours of free time during the workday.

Respondents' housekeeper testified that she took lunch when she wanted, was paid for extra work, and was not treated

---

[2] After testifying about having dual residences in the United States and Mexico, she denied plans to live in Mexico.

8

in a discriminatory way. She and Fonseca ate lunch together, sometimes for an hour or more. Fonseca never helped with cleaning, nor complained that respondents mistreated her, overworked her, or were discriminatory. The housekeeper saw Fonseca engage in personal activities while the children were at school, e.g., talk on the phone, meet with family or friends, or spend time with Max. The housekeeper disbelieved harsh things Fonseca said about respondents, opining that Fonseca had a "double personality" and was untruthful.

Respondents' former nanny in Chicago, who worked for them for 15 or 16 years, testified that she was treated with love and respect; no one made fun of her race. They paid for all her work.

## PROCEDURAL HISTORY

Fonseca sued respondents for harassment in violation of the Fair Employment and Housing Act (FEHA); failure to pay overtime; failure to provide meal and rest breaks; failure to pay minimum wages and wages upon termination; conversion; and unlawful or unfair business practices.

After a three-week trial, the jury returned a verdict for respondents. It found that Fonseca was a personal attendant who spent 80 percent of her work time supervising respondents' children; she did not work more than nine hours in a day or more than 45 hours a week without receiving overtime; she was not entitled to overtime compensation. Fonseca was not entitled to waiting time penalties because respondents paid her on her last day of employment. The jury found that respondents did not convert Fonseca's personal property. She was not subject to harassing conduct.

9

The court resolved Fonseca's claim of unfair business practices.  It determined that respondents are not a "business" but are a couple with children for whom they hired a nanny.  They did not provide goods or services to the public.  Though they employed Fonseca, this was not their "business."  After the court entered judgment for respondents, Fonseca moved for a new trial and JNOV; she claimed irregularity in the proceedings, jury misconduct, abuse of discretion, insufficiency of the evidence, and legal error.  The court denied the motions.

**DISCUSSION**

## 1.  Sufficiency of the Evidence

On appeal, we " 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.' " (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)  "Our task '*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted,' which will support the verdict.  [Citation.] Substantial evidence is any evidence that is ' "reasonable in nature, credible, and of solid value." ' " (*Garcia v. Myllyla* (2019) 40 Cal App.5th 990, 1000.)  We need not credit "the losing party's version of events." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

### a.  Appellant Waived Her Challenge

Fonseca selectively recites facts in her favor, ignores witnesses who refuted her testimony, then claims she is entitled to JNOV because the evidence is not in dispute.  Her brief violates rules of appellate review.  " 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,*

10

and *show how and why it is insufficient.'* " (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738; *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) " '[A]n attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent.' " (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620.) Fonseca's failure to fairly summarize the evidence waives her challenge to its sufficiency. (*Id.* at pp. 620–621; *Schmidlin*, at p. 738; *Doe*, at p. 218.)

### b. Wage, Overtime, and Waiting Time Claims

Appellant argues that "the whole of the evidence required judgment in [her] favor on her minimum wage, overtime, and waiting time causes of action." However, she does not discuss "the whole of the evidence," only the parts that serve her. We have reviewed the record and conclude that she is not entitled to judgment. The jury heard the testimony, assessed credibility, and resolved factual disputes for respondents. We do not reassess credibility on appeal. (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175.) The evidence supports the verdicts.

The jury found that Fonseca was a "personal attendant." A " 'personal attendant' " "includes baby sitters and means any person employed by a private householder . . . to work in a private household, to supervise, feed, or dress a child." (Cal. Code Regs., tit. 8, § 11150, subd. 2(J).) Employer recordkeeping requirements do not apply to child sitters. (Lab. Code, § 226, subd. (d).)[3]

---

[3] An employer must record and itemize hours worked, wages earned, and all deductions; however, this "does not apply to any employer of a person employed by the owner or occupant of

11

A personal attendant "shall not be employed more than nine hours in any workday or more than 45 hours in any workweek unless the employee receives one and one-half times the employee's regular rate of pay for all hours worked over nine hours in any workday and for all hours worked more than 45 hours in the workweek." (Lab. Code, § 1454.) Appellant is mistaken she is entitled to overtime after eight hours a day and 40 hours per week of work. Labor Code section 1454 expressly applies to personal attendants, and expands the maximum to nine hours per day or 45 hours per week of work, after which the employee is entitled to time and a half.

The jury heard conflicting evidence about Fonseca's typical workday and determined that she worked less than the maximum number of hours. Substantial evidence supports its finding. Respondents testified that she worked 12 to 20 hours per week—with free room and board for herself and Max. She was paid when she or they were away on vacation, amounting to some 180 days out of her 840 days of employment that she was doing zero work.

After taking the children to school, Fonseca was largely free for many hours. She did not go home to clean, because a housekeeper came daily. Using respondents' credit card, she grocery shopped for herself, Max, and sometimes for respondents. She prepared dinner several times a week for Max, herself, and

---

a residential dwelling whose duties are incidental to the ownership, maintenance, or use of the dwelling, *including the care and supervision of children*, or whose duties are personal and not in the course of the trade, business, profession, or occupation of the owner or occupant." (Lab. Code, § 226, subd. (a); *id.*, subd. (d), italics added.)

the family; she was not expected to cook but chose to do so because she enjoys it. Respondents also cooked, or ordered food delivery, or went out.

Fonseca agreed to a rate of $900 per week. Starting in January 2017, respondents paid her $100 per week for child sitting on Saturdays. The record shows she received biweekly checks for over $2,000. Appellant was happy with the arrangement, testifying that she was grateful Max lived in respondents' home, saving her the expense of renting elsewhere. Fonseca never told Max that respondents failed to fully pay her.

The jury rejected Fonseca's claims of slavery and overwork, and credited respondents' testimony that she was handsomely paid for doing little work, and no work at all when she or respondents were traveling. She was not entitled to time and a half for working zero to 20 hours a week. She received extra compensation for working a few hours on weekends.[4]

Fonseca claims that money she received for weekends was a "bonus" for extraordinary efforts. Respondents testified that it was payment for a few hours of child sitting; their testimony was supported by text messages with Fonseca. The jury believed respondents' testimony that Fonseca worked 12 to 20 hours per week. Thus, even if she child sat on a weekend, Fonseca worked half the maximum number of hours for a personal attendant. There was ample evidence from which a jury could find that she was not entitled to overtime.

---

[4] Appellant agrees that waiting time penalties derive from her wage and overtime claims. Because her claims of underpayment fail, she is not entitled to penalties.

13

Nothing compels a legal finding that respondents' cash payments were bonuses instead of compensation, as Fonseca urges. She relies on *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, in which an employer paid a $15 "attendance bonus" for working on a weekend, "regardless of whether the employee worked in excess of the normal work shift on the day in question." (*Id*. at p. 549.) Fonseca was not paid an "attendance bonus." She agreed to $100 for weekend work because her son enjoyed room and board in respondents' home.

Fonseca asserts she is entitled to reinstatement, or a new trial on her wage and overtime claims. She argues that the evidence in her favor is "undisputed," so the only issue is damages. Fonseca cites no authority for the notion that respondents must reinstate her, to live in their home. The evidence was far from undisputed. Respondents' testimony about making full payment was credible and documented, refuting Fonseca's claims of underpayment.

### c. Conversion Claim

Fonseca argues that the jury's rejection of her conversion claim is "contrary to all of the evidence." She testified that she was missing items when she left respondents' home. The jury did not believe her. It believed Mr. Foxman, who testified that Fonseca refused to pack her own belongings. Respondents later found and returned some clothing, but did not find her passport or other documents. The jury has the final say on witness credibility, and the testimony was conflicting, contrary to appellant's argument.

Text messages show that respondents exchanged fond words with Max and sought to give him a gift *after* Fonseca's termination. Mr. Foxman apologized for the turn of events and

14

invited Fonseca and Max to dinner, to say good-bye to the children.  There was no reason for jurors to believe that respondents kept Fonseca's belongings out of spite or ill will.

## 2.    Jury Instructions and Verdict Form

### a.  The Verdict Form

The jury rendered a special verdict.  (Code Civ. Proc., § 624.)  The special verdict form, reviewed de novo, is subject to harmless error analysis.  (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242, 1244–1245.)

The verdict form allowed the jury to find that Fonseca was a personal attendant and would receive overtime after working more than nine hours daily or 45 hours per week.  (Lab. Code, § 1454.)  Conversely, the jury could find that she was not a personal attendant and was entitled to overtime after working eight hours a day or more than 40 hours a week.  (*Id.,* § 515.)

Fonseca's complaint that the verdict lacked a minimum wage calculation is moot.  It is undisputed that the parties agreed to a rate of $900 per week.  The jury found she worked less than nine hours per workday, or 45 hours per workweek; 45 hours per week is $20 per hour.  If the jury credited respondents' testimony that Fonseca actually worked 12 to 20 hours per week, then she was paid at least $45 per hour.  California's hourly minimum wage for employers with fewer than 25 employees was $9 in 2016; $10 in 2017, and $10.50 in 2018.[5]  Fonseca was paid twice the minimum wage, or more.

---

[5] (<https://www.dir.ca.gov/iwc/minimumwagehistory.htm> [as of Dec. 12, 2024], archived at <https://perma.cc/5BCR-C2GP>.)

Once the jury found that Fonseca worked no more than nine hours per workday or 45 hours per workweek, it did not answer "how many hours" she worked beyond nine hours daily or 45 hours per workweek. It wrote "$0" in answer to the question, "[H]ow much overtime compensation is Rebeca Fonseca owed, if any?" The jury decided she was not deprived of overtime. Her theory that it did not understand the questions, believed that she worked 11 to 14 hours a day, or was given bonuses instead of wages, is pure speculation.

### b. The Special Instructions Were Proper

Fonseca argues that the special instructions given to the jury are erroneous as a matter of law. We find no error.

Instruction No. 1 states that an employee must be compensated for hours worked while under the employer's " 'control' " or " 'suffered or permitted' " to work. To make the instruction more digestible, the next two instructions explain these terms.

Instruction No. 2 explains what it means to be under the employer's "control," i.e., whether respondents "substantially prevented [Fonseca] from engaging in personal activities." The jury was instructed to "consider all of the circumstances." Factors to consider included whether she was required to undertake a specific activity; was disciplined for failing to do the activity; the activity benefitted respondents; and she had to be readily available to work—"known as on-call time."

Instruction No. 3 explains what it means to " 'suffer or permit' " Fonseca to work, and required proof of the following factors: respondents knew or should have known she was undertaking an activity she alleges was work; informed respondents that she considered the activity work or they should

16

have known it was; she undertook the activity for respondents' benefit; and they did not take steps to prevent work from occurring.

In conjunction, these three instructions adequately explain the law. They are complementary, not contradictory.

Fonseca cites *Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 848, holding that "sleep time" cannot be excluded from compensable hours for a security guard working a 24-hour shift. Fonseca did not work 24 hour shifts. *Frlekin v. Apple Inc.* (2020) 8 Cal.5th 1038, 1056, is inapposite: It addresses compensation for time employees spent undergoing a bag search when leaving the workplace. Instruction No. 2 adequately summarized the *Frlekin* control factors, which only apply to "*onsite* employer-controlled activities." (*Ibid.*)

Appellant contends that instruction No. 3 improperly required proof of four factors showing " 'suffered or permitted' to work" when only one factor was necessary to prove her case. The suffer or permit to work standard applies to household workers. (Cal. Code Regs., tit. 8, § 11150, subd. 2(E), (H).) The term has traditionally applied to employers who knew that illegal or underpaid work was occurring in the enterprise. "[T]he basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 70; *Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829, 840 ["employer knew or should have known that the employee was working on its behalf"].)

Instruction No. 3 addresses respondents' knowledge of Fonseca's work hours. Most hourly employees work on premises, under the eye of their employer. By contrast, Fonseca spent time outside the house supervising the children or shopping. To

17

address respondents' inability to know where Fonseca was or what she was doing—she may have been dining out or shopping for herself and Max, not working for them—the instruction included language that Fonseca had to inform respondents that she was working, to show their knowledge of her work and failure to hinder it. (*Martinez v. Combs, supra,* 49 Cal.4th at pp. 69–70.)

Even if this language should have been excluded, it was harmless. The jury disbelieved Fonseca's testimony that she spent a great deal of time shopping and doing errands for respondents. As she argued in closing, "she's doing all these personal errands [and] running around" and so was not a personal attendant. Instead, the jury credited respondents' testimony that she seldom did errands, amounting to less than 5 percent of her work time. Ultimately, Fonseca did so little extra work outside the house that it did not matter whether she informed respondents of it.

Instruction No. 4 defined "personal attendant" as "a household employee who spends 80% or more of their working time supervising, feeding, or dressing children." Appellant claims this is incorrect because the regulation refers to "a child," not "children." (Cal. Code Regs., tit. 8, § 11150, subd. 2(J).) She does not cite any authority holding that the regulation applies only when there is one child to tend. (See *Liday v. Sim* (2019) 40 Cal.App.5th 359, 365–366 [plaintiff was a live-in personal attendant for two autistic children].)

Instruction No. 5 states that the method for calculating overtime for a personal attendant differs from a non-personal attendant: Overtime begins when the personal attendant works more than nine hours in a workday or 45 in a workweek. Appellant argues that the correct number is 40 hours, not 45.

18

However, Labor Code section 1454 provides that a personal attendant receives time and half for working more than nine hours in a workday or more than 45 hours in a workweek. In any event, the rate of calculating overtime does not matter because the jury found that Fonseca did not work more than the maximum allowable hours and no overtime is due.

### c. Rejection of Appellant's Special Instructions

The court refused appellant's proposed special instructions (PSI's). "A trial court may properly refuse to give requested instructions when they are either erroneous or repetitive of other instructions already given." (*People v. Turner* (1994) 8 Cal.4th 137, 203.) We conclude that appellant's PSI's were erroneous, misleading, or repetitive.

PSI No. 1 states that Fonseca's flat-rate wages covered eight hours a day and 40 hours in a workweek. This is covered in special instruction No. 1 ("calculating overtime hours for a non-personal attendant") and special verdict No. 2 regarding the hours of an employee who is *not* a personal attendant. PSI No. 1 is moot because the jury found that Fonseca spent more than 80 percent of her work time supervising children and was a personal attendant.

PSI No. 2 states that respondents bear the burden of proving that an employee is a personal attendant. It is redundant. The jury was instructed that respondents "bear the burden of proving that at least eighty (80%) of Rebeca Fonseca's time was spent supervising, feeding, or dressing" their children. PSI No. 11 states that if the panel finds Fonseca is a personal attendant, she is "still owed" overtime for hours worked in excess of nine hours per day or 45 hours per week. It is redundant. The

19

jury was instructed that a personal attendant is entitled to overtime for hours worked in excess of the statutory maximum.

PSI No. 5 proposed a definition of hours worked while under the employer's control, and suggested that Fonseca had to be compensated "for all of the time she was required to be" at the residence or other location. The jury was instructed about when an employee is under the employer's "control" or "suffered" work, and when she was on-call. Appellant's proposed instruction was unnecessary.

PSI No. 6 stated that state law requires employers to keep accurate records of an employee's hours, adding, "This instruction applies whether or not you determine Plaintiff was a personal attendant." PSI No. 6 misstates the law. Employers need not document the hours of a child sitter. (See fn. 3, *ante*.) In the same vein, the court correctly modified CACI No. 2703 to read that employers must keep hourly records "unless the employee is a personal attendant." Contrary to Fonseca's argument, the jury was instructed that she may prove overtime hours worked "by making a reasonable estimate" if the employer lacks records.

PSI No. 9 stated that money Fonseca received for working some weekends "should be considered a lump sum bonus." Fonseca does not cite evidence showing that she or respondents believed she was paid a bonus. Instead, respondents testified that it was pay that the parties agreed to in January 2017, when Max moved into the home; he and his mother began living there 24/7 to save money.

PSI No. 10 stated that an on-call employee is owed compensation if required to wait, at a residence, for the benefit of the employer. It read, "Anytime that you find that Plaintiff was required to be at the Foxman's [*sic*] home is working time for

20

Rebeca Fonseca and she should have been compensated for that time." This is misleading. It would encourage the jury to find that Fonseca was working whenever she was at respondents' home. She and Max lived there, including weekends, to save money on rent. An employee who resides with an employer is not entitled to compensation for all time spent there. (*Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 32–33 [sleeping time is not compensable if the employee resides on the premises and has no other home].)

## 3.     Exclusion of Expert Witness Testimony

The court granted respondents' motion in limine to exclude expert testimony from labor lawyer Jan Duffy. We review the ruling for abuse of discretion: It must be so irrational or arbitrary that no reasonable person could agree with it. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

Duffy specializes in industrial human relations and lacks expertise in household workers. She would have testified that respondents used irresponsible business practices by not withholding taxes, sometimes giving appellant cash, not keeping time records, and not setting clear expectations on Fonseca's hours and duties. She would testify that respondents, as employers, had to admonish their children not to say racist things. The court noted that industry standards for complying with FEHA do not apply to parent-child relationships. It ruled that Duffy's testimony would not assist the trier of fact.

Respondents' business practices and tax withholding were not before the jury. They did not have to keep time records for a live-in childcare worker. Rules applying to the "micro-employer" envisioned in appellant's brief do not apply to respondents. Her

21

citation of cases involving employers like the University of California, FedEx, and a fire department are not helpful.

No expert was needed to help jurors make its critical determinations, which hinged on witness credibility. The jury could believe respondents' testimony that Fonseca was at leisure most of the workday. Or it could believe Fonseca's testimony that she slaved away without lunch or rest for over 12 hours a day. It could find that she was a personal attendant who spent 80 percent of her time supervising children, or it could find she spent most of her time doing errands. This was not within the scope of Duffy's proposed testimony.

FEHA requires that an "entity, or its agents or supervisors" prevent harassment. (Gov. Code, § 12940, subd. (j).) Respondents are a family, not an entity. In any event, the alleged misbehavior consisted of a few incidents of mockery, teasing, or repeating a racially charged term from rap music. Harassment focuses on severity, pervasiveness, and interference with work performance. Teasing, offhand comments, or isolated incidents are not actionable. (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 628.) Fonseca presented no evidence of pervasive, severe harassment under FEHA that interfered with her work; the jury found that she was not subject to any harassment at all. It believed respondents' testimony that their family would never engage in harassment based on race or heritage. No expert was needed to assist with this determination.

4. **Due Process Violation**

Fonseca contends that the court denied her a fair trial by (1) admitting character evidence, and (2) admitting respondents'

22

estimates of her hours while excluding her estimates.  We find no error resulting in a miscarriage of justice.  (Evid. Code, § 353.)

### a.  Character Evidence

Fonseca argues that the trial court improperly allowed evidence about her character, including her text message to Max referring to a Foxman child as a "slut."  Fonseca put the family's character at issue by claiming they treated her like a slave and offended her with mockery based on her Mexican heritage.  In opening statements, she contrasted her "sincere" love for the Foxmans with their poor treatment of her.  Her argument was, "You can't hide or fake it when you don't care about the children."

Fonseca opened the door to evidence showing that she was faking it. She testified that she felt "kind and loving" toward the children.  She was then impeached with her text messages calling respondents' child a "slut" and "ugly," and their eight-year-old a "faggot."  This evidence went to Fonseca's credibility and was admissible.

Fonseca moved to exclude evidence that respondents funded the education of a Mexican youngster and assisted migrants from Mexico.  The court allowed the evidence.  This was not an abuse of discretion.  Fonseca accused respondents of being racist enslavers with animus toward people from Latin America.  To counter this accusation, Mrs. Foxman could testify that she lived in Mexico for years, speaks fluent Spanish, and is devoted to helping immigrants.  By asserting that the Foxmans are racially biased, Fonseca opened the door to testimony showing that, in fact, they actively help Latin Americans.

### b.  Estimates of Hours Worked

The court admitted a "timeline" created by Mrs. Foxman based on her calendar, text messages, and photos, to establish

Fonseca's vacations and work time, and respondents' vacations. The court found that the timeline was "illustrative of her testimony" and not prejudicial. Fonseca objected to the timeline and claims that the court compounded the error by refusing to admit her estimates and calculations of time worked.

Appellant incorrectly contends that the timeline was respondents' "only evidence of hours worked by Fonseca." Mrs. Foxman spent hours on the witness stand detailing Fonseca's work schedule and vacation time, using the timeline. Fonseca testified about her work schedule and the slavery she claims to have endured, but did not attempt to use a timeline until closing argument. The court properly refused the jury's request to examine counsel's demonstrative of appellant's hours, displayed during closing argument, because it "was not admitted into evidence." The court declined counsel's suggestion to readback closing argument. This was not error: Closing argument is not evidence and the jury did not request a readback.

## 5. Unfair Business Practice Claim

The court rejected Fonseca's claim under the Unfair Competition Law (UCL). (Bus. & Prof. Code, § 17200 et seq.) Appellant cited respondents' failure to keep time records as an unlawful business practice. Respondents argued that the UCL does not apply to a nanny. The trial court found that the UCL does not apply because respondents do not provide goods or services to the public.

"The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.) The UCL relates to the conduct of a business, and does not apply, for example, to a homeowners' association that "does

not participate as a business in the commercial market, much less compete in it." (*That v. Alders Maintenance Assn.* (2012) 206 Cal.App.4th 1419, 1427.) Appellant cites no case applying the UCL to a family's use of a nanny. Instead, she relies on inapposite cases involving commercial operators, i.e., an insurance company and newspaper publisher.

Apart from the dubious application of the UCL to a nanny in a private home, appellant unavailingly claims that the predicate to her unlawful practices claim is a statute requiring an employer to keep "payroll records showing the hours worked daily" by an employee. (Lab. Code, § 1174, subd. (d).) The recordkeeping requirement does not apply to a person who works in a home caring for children. (Lab. Code, § 226, subd. (d).)

## CONCLUSION

Though appellant claims many errors, none of the court's rulings—individually or collectively—caused a miscarriage of justice or require a new trial. The jury had to determine if appellant or respondents were telling the truth about her work environment, and disbelieved Fonseca. Substantial evidence supports the jury's credibility determination.

25

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to recover their costs on appeal from appellant.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


RICHARDSON, J.